968 A.2d 192 (2009)
406 N.J. Super. 453
Robert R. DEAN, Jennifer P. Dean, and Mary Sue Dean, Plaintiffs-Appellants,
v.
BARRETT HOMES, INC., Lincoln Wood Products, Inc., Sto of New Jersey, Inc., Sto Eastern, Inc., Architectural Exterior Finishes, Inc., and Housemaster, Inc., Defendants, and
Sto Corp., Defendant-Respondent.
A-1479-07T1
Superior Court of New Jersey, Appellate Division.
Argued September 22, 2008.
Decided April 15, 2009.
*193 Peter L. Davidson, argued the cause for appellants (Davidson Legal Group, LLC, attorneys; Mr. Davidson and Kenneth A. Spassione, Jr., Roseland, on the brief).
David N. Cohen, argued the cause for respondent (Edwards, Angell, Palmer & Dodge, LLP, attorneys; Mr. Cohen, Andrew P. Fishkin, Madison and Robert Benacchio, River Edge, on the brief).
Before Judges CARCHMAN, SABATINO and SIMONELLI.
The judgment of the court was delivered in an opinion by
CARCHMAN, P.J.A.D.
Plaintiffs Robert R. Dean (Robert),[1] Jennifer P. Dean (Jennifer) and Mary Sue Dean appeal from a final judgment of the Law Division dismissing their complaint against Sto Corp.[2] (Sto). The claims arise as a result of damages caused by the manufacture and installation of allegedly defective exterior siding that was used on a house purchased by plaintiffs from the original owners. Plaintiffs asserted two primary causes of actiona claim under the Consumer Fraud Act (CFA), N.J.S.A. 56:8-1 to -184, and the Products Liability Act (PLA), N.J.S.A. 2A:58C-1 to -11. The motion judge granted summary judgment to defendant Sto as to both causes of action. We affirm.
These are the relevant facts derived from the record. On February 18, 2002, Robert and Jennifer entered into a contract for the purchase of a house located at 7 Rechtenwald Court in Old Tappan. The sellers were Angelo and Maria Messina (the Messinas), the original owners, who had purchased the house in 1995 from defendant Barrett Homes Inc. (Barrett).
Sto was the manufacturer of the exterior siding product used on the house. Barrett had subcontracted the siding work to defendant Architectural Exterior Finishes. William E. Borra, Jr., Barrett's representative, claimed only that Sto had brought him some samples of the siding product for him to examine, and no other representations were made to Barrett regarding the siding.
The Messinas neither had any problem with the house nor were familiar with the stucco material used on the house's exterior. Although the builder may have provided them with some literature regarding the siding, they did not read it, and they never discussed the siding with Barrett or Sto. The Messinas never told plaintiffs that the exterior was maintenance-free, and they never gave plaintiffs any documents or literature regarding the exterior siding.
Likewise, plaintiffs' realtor never spoke to or gave any information to plaintiffs regarding the product used on the exterior of the house. Prior to closing, plaintiffs never gave any thought to the exterior of the house, other than to assume it was "stucco" and maintenance-free, even though no one had made that representation to them. They neither asked for nor received any information from Sto, and they never received any warranties regarding the exterior of the house.
Plaintiffs did act affirmatively to protect their investment in the house. On February 26, 2002, plaintiffs secured a house inspection performed by defendant HouseMaster, *194 Inc. Prior to the inspection, plaintiffs learned that their insurance carrier would not insure a house with stucco. When Robert mentioned this to the inspector, the inspector said that the carrier was probably worried about a cable company or phone installer punching a hole in the siding, which could allow water that could not be immediately seen, to get behind it. He told Robert to make sure that all holes were caulked. Otherwise, according to the inspector, the siding on the house was an excellent insulator.
The inspector also told Robert that the siding was an Exterior Insulation Finishing System (EIFS), an unfamiliar term to plaintiffs. Plaintiffs admitted that, even after they learned that their house was clad with EIFS, they did no research on the product or the manufacturer. Robert claimed that there was no need to do any research because he could tell by his observations that the house did not require any painting.
In its report, which plaintiffs admitted they did not read in any great detail, HouseMaster warned: "While no visible defects were noted, this type siding [sic] can be prone to hidden defects. Keep siding/stucco well sealed and seal as req'd, such as at siding penetrations for lawn sprinkler control wiring and at bruised area near the ground behind downspout." Robert concluded that this statement was consistent with his conversation with the HouseMaster inspector, and that there was nothing to worry about. However, the report also stated that:
Exterior Insulation Finish Systems (EIFS) incorporate foam insulation panels, reinforced mesh and a textured finished coating. Certain products and/or installation methods make this wall-cladding system highly susceptible to moisture infiltration and subsequent structural damage and mold particularly at penetrations, joints, and roof terminations. Recommend evaluation by a specialist and/or the manufacturer as a precaution.

[(Emphasis added).]
Robert conceded that this cautionary statement was not consistent with what he had been told by the HouseMaster inspector, and he took no action in response to this report.
Plaintiffs took title to the house on May 14, 2002. At closing, the Messinas told plaintiffs that there was a bucket of "Sto" in the garage that had been left by the builder in case they needed it for a "touch-up." Plaintiffs assumed that "Sto" was the manufacturer of the exterior product.
Approximately one year after moving in, plaintiffs began to notice black lines over the exterior of the house. Jennifer thought she could use the material in the bucket to touch it up, but when she called the manufacturer or distributor, she learned that she could not simply paint the material on but needed to follow "a process." A family member then told plaintiffs that he had seen a news report regarding the hidden dangers of stucco. Despite the earlier warning from the home inspector, Robert finally did some research and learned that there had been many problems with other houses that had been finished with EIFS.
EIFS is an "exterior cladding component of the building envelope" and is not sold as a final product. The "traditional" EIFS consists of:
(1) an adhesive; (2) expanded polystyrene ("EPS") board; (3) base coat; (4) reinforcing mesh; and (5) finish coat. The mesh is sold in rolls, EPS board sold in large sheets, and the adhesive, base and finish coats sold in buckets. The EPS board and mesh are cut and sized by the contractors usually at the *195 jobsite, and the adhesive, base coat and finish coat are applied with the EPS board and mesh to the building by the contractors.
According to plaintiffs, the defect in defendant's product was that "[t]here [was] no secondary weather protection behind the cladding to protect the underlying moisture sensitive substrate and no means of drainage of water which may penetrate the wall assembly." Their expert found that plaintiffs had sustained water damage to the wall sheathing and framing of their house due to water intrusion behind the EIFS cladding. The expert found fifteen deficiencies in the installation of the EIFS that had caused this water intrusion. In addition, the expert found that the EIFS itself was defectively designed, because: "Standard installation specifications, details, and instructions by EIFS manufacturers did not adequately address actual field conditions encountered and also required installation that could not be achieved."
Plaintiffs were advised to undertake the following remediation to their house: "Removal of the EIFS, repairs to water-damaged structural components, installation of new cladding, windows and doors, and repairs to improperly installed and constructed building components should be performed as soon as possible due to the ongoing water intrusion."
Ultimately, plaintiffs removed and replaced their exterior siding, at a cost approximating $65,000. In addition, they spent another $85,000 to do the consequential work associated with this removal and replacement. This additional work included repairs to the interior of the house, replacement of their fireplace, repairs to the roof and soffits, and installation of new windows and doors. However, plaintiffs admitted that the fireplace work had nothing to do with the removal of the EIFS. They claimed damage to the underlying sheathing, framing and substrate of the house.
In addition, although toxic mold was found inside plaintiffs' house, they did not pursue any personal injury claim against defendant. Also, they admitted that they did not perform any work on the interior of the house to remediate or eliminate the mold, that no personal property in the house was damaged, and that no landscaping required any replacement. Jennifer claimed that there was a "stigma" associated with the mold, as well as a diminution in the value of their home, although she could not state whether the house had in fact decreased in value.
Plaintiffs filed a complaint in the Law Division against Barrett, Sto, HouseMaster and Architectural and others, alleging, among other causes of action, negligence, breach of implied and express warranties, consumer fraud and strict liability. Following extensive discovery, Sto filed a motion for summary judgment.
In opposition to summary judgment, plaintiffs presented an array of materials that supported their position that defendant was aware of the defects and problems with their EIFS since at least the 1980s, that they were responsible for selling and distributing the EIFS and putting it into the stream of commerce, and that they had been engaged in a great deal of litigation regarding their EIFS, both here in New Jersey and in other states.
The trial judge dismissed plaintiffs' claims for strict liability and negligence because he found that plaintiffs had sustained an "economic loss" only. That is, defendant's product was defective and had to be removed, which may have caused some incidental or consequential damage to plaintiffs' house, but the house itself was not destroyed, was not rendered unsafe or *196 uninhabitable, and plaintiffs had not sustained any personal injuries. He dismissed their CFA claim because defendant had no contact whatsoever with plaintiffs and made no misrepresentations to them. Plaintiffs' motion for reconsideration also was denied.
On appeal, plaintiffs assert that the motion judge erred by improperly applying the economic loss rule, resulting in dismissal of plaintiffs' tort claim, and further erred in concluding that the CFA did not apply.
Subsequent to oral argument in this matter, we decided Marrone v. Greer & Polman Constr. Inc., 405 N.J.Super. 288, 964 A.2d 330 (App.Div.2009), where, on facts strikingly similar to those before us here, we held that the CFA did not apply and "plaintiffs' claims based on the Products Liability Act ... were properly dismissed under the economic loss doctrine because the only claimed damage was to the house, of which the siding was a component." Id. at 290-91, 964 A.2d 330.
We briefly describe the facts in Marrone. In 1995, the DeCilveos contracted to build a new home. The home included stucco sidingEIFSmanufactured and distributed by Sto. In 2003, the Marrones purchased the home from the DeCilveos who had experienced no problem with the siding. As here, the DeCilveos had no contact with Sto, received no warranties and did not rely on any representations regarding the siding. After the Marrones purchased the home, they received a letter from their homeowners insurance company threatening to cancel their coverage because of the siding. Additionally, they discovered that the EIFS siding was defective. Thus, the Marrones brought a cause of action against various defendants, including Sto. The same expert who presented a report on plaintiffs' behalf here, also presented a report in Marrone. As we noted:
A September 2005 expert report provided to plaintiffs by R.V. Buric indicated that the construction contractor had improperly installed the EIFS cladding. However, Buric also opined that the EIFS system was poorly designed because it depended on the applied cladding being perfectly water-tight and had no back-up system to carry moisture away from the exterior walls if water penetrated behind the cladding. Buric found damage to the EIFS cladding itself, as well as water damage to sheathing and wood framing and to some windows.
[Id. at 292, 964 A.2d 330.]

I.
We first address the claim under the CFA. In Marrone, we rejected the plaintiffs' claim for relief under the CFA. Holding that our decision in Chattin v. Cape May Greene, Inc., 216 N.J.Super. 618, 524 A.2d 841 (App.Div.), certif. denied, 107 N.J. 148, 526 A.2d 209 (1987), was dispositive, we rejected plaintiff's reliance on Perth Amboy Iron Works, Inc. v. American Home Assurance Co., 226 N.J.Super. 200, 543 A.2d 1020 (App.Div. 1988), affd o.b., 118 N.J. 249, 571 A.2d 294 (1990), concluding that the case involved representations that were made or intended to be made to the buyer. Marrone, supra, 405 N.J.Super. at 295, 964 A.2d 330. We noted,
[I]n this case, the evidence indicated that Sto actively marketed its EIFS cladding to builders and architects and other construction professionals. Unlike Perth Amboy[,] ... however, there is no evidence that Sto's representations were conveyed to the DeCilveos or to plaintiffs or that they were even aware that *197 the EIFS cladding was part of the house.
[Ibid.]
Finally, on the issue of Sto creating a misrepresentation by omission rather than an affirmative statement, we concluded that there was no proof that Sto intentionally concealed any information "`with the intention that plaintiff[s] would rely on the concealment, and that the information was material to the transaction.'" Marrone, supra, 405 N.J.Super. at 297-98, 964 A.2d 330 (quoting Judge v. Blackfin Yacht Corp., 357 N.J.Super. 418, 426, 815 A.2d 537 (App.Div.), certif. denied, 176 N.J. 428, 824 A.2d 157 (2003)).
A similar result was reached in Shannon v. Boise Cascade Corp., 208 Ill.2d 517, 281 Ill.Dec. 845, 805 N.E.2d 213 (2004), where several homeowners brought consumer fraud claims against the manufacturer of composite wood siding that had been used on their homes. The plaintiffs alleged that the defendant had deceptively advertised its product and fraudulently failed to disclose that its product performed poorly in the field. None of the plaintiffs had received any representations regarding the siding from the defendant. Five of the plaintiffs were subsequent purchasers of the house, while two of the plaintiffs were original owners who had reviewed brochures from the builder containing the builder's representations regarding the siding. There was no claim that any particular builder, architect, or engineer had received any product literature from the defendant or that any plaintiff, in deciding whether to purchase their home, had communicated with anyone who had received literature from the defendant.
In holding that the consumer fraud claims could not be sustained, the Illinois Supreme Court held that deceptive advertising could not be the basis for a claim under the Illinois statute "unless it actually deceives the plaintiff." Id. at 217. The Court found that the crux of the plaintiffs' claim was that the defendant's "alleged deceptions created a market for their product that would not otherwise exist, thus resulting in its use on their homes and the plaintiffs' ultimate damages." Ibid. Although recognizing that it was possible that the siding might not have been installed on the plaintiffs' homes but for the defendant's promotional literature, the Court held:
It does not follow, however, that the literature distributed to unnamed persons 20 or more years ago, who may or may not have been deceived, induced plaintiffs to accept the siding. Without such a nexus, the alleged deception is simply too remote from the claimed damages to satisfy the element of proximate cause.
[Id. at 218.]
The rule in Shannon applies with equal force to plaintiffs here.
We adopt the reasoning in Marrone and conclude that the motion judge properly dismissed the CFA cause of action. As in Marrone, plaintiffs here neither received nor relied on any misrepresentation by Sto. The statute requires, among other things, misrepresentation or omission of material fact with intention of reliance, N.J.S.A. 56:8-2, and none of those elements are present here. There is no nexus between plaintiffs' purchase of the house and Sto's conduct or lack thereof.

II.
We reach a similar result in regard to the claim under the PLA. Plaintiffs claim that the judge erred in dismissing their tort-based claims because it: failed to recognize that a house is unique and is not subject to the provisions of the Uniform *198 Commercial Code (UCC); failed to recognize that plaintiffs had no privity with defendant; mistakenly believed that plaintiffs had to show damage to their house of a certain magnitude in order to be able to recover under the PLA; misconstrued the case law regarding application of the economic loss doctrine; and failed to understand plaintiffs' inability to avoid the risk posed to them by defendant's product. In Marrone, we concluded that the PLA did not apply under the facts presented on that appeal. Marrone, supra, 405 N.J.Super. at 297-304, 964 A.2d 330.
The law in New Jersey has evolved in the area of strict liability. For many years, the New Jersey rule, first espoused in Santor v. A & M Karagheusian, Inc., 44 N.J. 52, 207 A.2d 305 (1965), was that the purchaser of a product could recover in strict liability or negligence from the manufacturer or seller for damage to the product itself. This minority view was directly contrary to the one taken by the majority of courts, which followed the holding of the California Supreme Court, pronounced in Seely v. White Motor Co., 63 Cal.2d 9, 45 Cal.Rptr. 17, 403 P.2d 145 (1965), that the law of warranty precluded imposing tort liability if a defective product caused monetary harm only. Subsequently, the United States Supreme Court adopted an approach similar to Seely and held that "a manufacturer in a commercial relationship has no duty under either a negligence or strict products liability theory to prevent a product from injuring itself." East River S.S. Corp. v. Transam. Delaval, 476 U.S. 858, 871, 106 S.Ct. 2295, 2302, 90 L.Ed.2d 865, 877 (1986).
The Court noted that the losses sustained by a commercial user when the product injures itself are ones that can be insured against, that the increased cost to the public that would result from allowing the manufacturer to be sued in tort for injury to the product itself is not justified, and that damage to a product itself is most naturally understood as a warranty claim. Id. at 871-72, 106 S.Ct. at 2302, 90 L.Ed.2d at 877. "Such damage means simply that the product has not met the customer's expectations, or, in other words, that the customer has received `insufficient product value.' ... The maintenance of product value and quality is precisely the purpose of express and implied warranties." Id. at 872, 106 S.Ct. at 2302-03, 90 L.Ed.2d at 877-78 (citation and footnote omitted). The Court also noted that commercial situations generally do not involve large disparities in bargaining power and that the parties could allocate their own risks. Id. at 872-73, 106 S.Ct. at 2303, 90 L.Ed.2d at 878.
Essentially, this was the same position taken by our own Supreme Court one year earlier, in Spring Motors Distributors, Inc. v. Ford Motor Co., 98 N.J. 555, 489 A.2d 660 (1985). That is, the Court noted that the UCC was "the more appropriate vehicle for resolving commercial disputes arising out of business transactions between persons in a distributive chain," id. at 571, 489 A.2d 660, and that the considerations that gave rise to strict liability did not apply between commercial parties with comparable bargaining power. Id. at 576, 489 A.2d 660. It held that, with respect to commercial buyers, strict liability was not "an appropriate basis of a claim for economic loss." Id. at 577-78, 489 A.2d 660. Rather, the UCC was "`generally regarded as the exclusive source for ascertaining when a seller is subject to liability for damages if the claim is based on intangible economic loss not attributable to physical injury to person or harm to a tangible thing other than the defective product itself.'" Id. at 581, 489 A.2d 660 (quoting W. Prosser & W. Page Keeton, Handbook of the Law of Torts § 95A at 680 (5th ed. 1984)) (emphasis added).
*199 Thereafter, in Alloway v. General Marine Industries, L.P., 149 N.J. 620, 626, 695 A.2d 264 (1997), the issue was whether the purchaser of a defective boat could sue in tort to recover the cost of repairs to the boat and lost trade-in value. No other property of the plaintiff was alleged to be damaged. Id. at 626-27, 695 A.2d 264.
The Court noted that tort principles were better suited to resolve personal injury claims or claims for damage to "other property," while contract principles were better suited to claims for "economic loss caused by damage to the product itself." Id. at 627, 695 A.2d 264. "[E]conomic loss encompasses actions for the recovery of damages for costs of repair, replacement of defective goods, inadequate value, and consequential loss of profits." Ibid. Citing both East River and Spring Motors, Alloway held that factors relevant to the distinction between the two theories of recovery included the relative bargaining power of the parties and the "allocation of the loss to the better risk-bearer in a modern marketing system." Id. at 628, 695 A.2d 264 (internal quotations and citations omitted).
In Alloway, the plaintiff had purchased a luxury item and was not at any disadvantage when bargaining for its purchase. Moreover, he had protected himself against the risk of loss through the purchase of an insurance policy. Id. at 629, 695 A.2d 264. The Court found that the vast majority of courts across the country had concluded that "purchasers of personal property, whether commercial entities or consumers, should be limited to recovery under contract principles." Id. at 633, 695 A.2d 264. The Court also noted that the then-proposed Restatement (3d) of Torts: Products Liability § 21 defined economic loss to exclude recovery in tort for damage to the product itself. Id. at 636, 695 A.2d 264.[3]
Significant here, Alloway declined to resolve the issue of which law should apply when the defective product poses a serious risk to other property or persons. Id. at 638, 695 A.2d 264. Also, the Court did not reach the issue of preclusion of a strict liability claim "when the parties are of unequal bargaining power, the product is a necessity, no alternative source for the product is readily available, and the purchaser cannot reasonably insure against consequential damages." Id. at 639, 695 A.2d 264. The Court noted that, in addition to recovery under the UCC, a purchaser might possess rights under common law fraud, the CFA, or various other state or federal statutes designed to protect consumers. Id. at 639-40, 695 A.2d 264. The Court specifically noted that the PLA was not intended to codify all common law remedies, so that the exclusion in that statute of harm to the product itself, see footnote 3, supra, was not dispositive. Id. at 640, 695 A.2d 264.
Plaintiffs here argue that their case is governed by the questions left unanswered by Alloway. That is, they claim that they did sustain damage to "other property," *200 that they did not possess equal bargaining power with defendant, and that their home was a necessity. They also argue that their case is governed by our decision in DiIorio v. Structural Stone & Brick Co., Inc., 368 N.J.Super. 134, 845 A.2d 658 (App.Div.2004). We disagree.
In DiIorio, the plaintiff had contracted with a builder for the construction of a home. Although the plaintiff did not have a separate agreement with the builder's stone supplier, he did meet with the supplier, who represented that his stones were of high quality and suitable for exterior use. Id. at 137-38, 845 A.2d 658.
After closing, the stones began to flake and permitted moisture to infiltrate, causing staining, flaking, and shearing of the interior and exterior stone. Ultimately, the stone had to be removed and replaced, which resulted in damage to other portions of the house, to the deck, and to landscaping. Id. at 138, 845 A.2d 658.
The defendant's motion to dismiss the claim as time-barred under the UCC was denied, and the defendant appealed. As we observed, the question presented was whether the plaintiff's claim was limited to the UCC or whether he could pursue claims based in tort. Id. at 140, 845 A.2d 658. We noted that Alloway had extended Spring Motors' holding to "transactions in goods involving non-commercial buyers." Id. at 140, 845 A.2d 658. However, common law and statutory claims were still available to consumers "if goods cause damage to other property." Ibid. (footnote omitted). We found that the plaintiff in DiIorio had alleged damage to other property, specifically damage to other portions of his house, to his deck, and to his landscaping, and that his loss was thus not limited to the value of the stones themselves. Id. at 141, 845 A.2d 658. Hence, his recovery was not limited to the UCC. Ibid.
We also noted that the UCC would not govern the plaintiff's claim since it did not apply to transactions in real property. Ibid. Moreover, the transaction could be viewed as one for the rendition of services, i.e., the construction of a home, which incidentally included the provision of certain goods. Ibid. In such a mixed transaction, that is, a hybrid of sales and service, a court had to ascertain the primary purpose of the transaction. Id. at 141-42, 845 A.2d 658. We found that the plaintiff had
entered into a transaction with a builder and although he was introduced to the builder's supplier of stone, the predominant aspect of his transaction was with the builder. The price paid by plaintiff to the builder included the value of the stone and labor costs associated with its installation onto the facade of the home. To the extent the transaction may be rightly characterized as a transaction in goods, that aspect was, at most, incidental. Under such circumstances, the four year statute of limitations of the U.C.C. does not bar plaintiff's cause of action.
[Id. at 142, 845 A.2d 658.]
As we observed in Marrone, our decision in DiIorio focused on the nature of the transaction, and we carefully crafted our language to characterize this as "primarily one for the professional services of a builder." Marrone, supra, 405 N.J.Super. at 303, 964 A.2d 330. The discussion in DiIorio regarding the economic loss doctrine was dicta since we held that plaintiff's claim was not barred by the four year statute of limitations under the U.C.C., due to the nature of the transaction, which was one for professional services rather than the sale of goods.
DiIorio neither was compelled to nor did it reach or address the critical issue here, that is whether "when a component part of a product or a system injures the rest of the product or the system, only *201 economic loss has occurred." Wilson v. Dryvit Sys., 206 F.Supp.2d 749, 753 (E.D.N.C.2002), aff'd, 71 F.App'x 960 (4th Cir.2003). This issue was addressed and decided, adverse to plaintiffs' position, in Marrone.
The critical issue here has arisen in the context of a building defect, specifically in the context of a defect in exterior siding, such as EIFS or a similar product, causing damage to other parts of the structure.[4] In Wilson, for example, the federal district court held that the defendant's exterior cladding product was an integral component of the plaintiff's house. 206 F.Supp.2d at 754. The damage it caused to the plaintiffs' sheathing, framing, doors, windows, and sub flooring, by virtue of its allowing moisture intrusion behind the faces of the house, was damage to the house itself and did not constitute "other property" damage so as to allow the plaintiffs to avoid the economic loss rule and sue in tort. Id. at 753-54.
This same result has been reached in other jurisdictions. See, e.g., Wash. Courte Condo. Ass'n-Four v. Wash.-Golf Corp., 150 Ill.App.3d 681, 103 Ill.Dec. 752, 501 N.E.2d 1290, 1293-94 (1986) (holding that damage to insulation, walls, ceilings, floors, and electrical outlets that was caused by defendant's negligence in installing windows and doors that allowed water and air to intrude into plaintiffs' units, was not damage to "other property" and was economic loss only); Calloway v. City of Reno, 116 Nev. 250, 993 P.2d 1259, 1267-69 (2000) (applying economic loss doctrine to negligence claim against subcontractor based on damage to flooring and ceilings and structural and wood decay, caused by water intrusion from defective framing of house);[5]Weiss v. Polymer Plastics Corp., 21 A.D.3d 1095, 802 N.Y.S.2d 174, 175-76 (2005) (dismissing plaintiffs' tort claims for damage to EIFS siding and to plywood substrate attached to their home due to water infiltration, since such claims were for "economic loss" only due to product failure); Pugh v. Gen. Terrazzo Supplies, Inc., 243 S.W.3d 84, 92-94 (Tex.Ct.App. 2007) (noting that economic loss doctrine precludes tort claims against supplier of defective component part that causes damage to finished product into which component is incorporated; this doctrine applies to claim against use of EIFS in residential or commercial construction), review denied, 2008 Tex. Lexis 607 (Tex.2008); Bay Breeze Condo. Ass'n, Inc. v. Norco Windows, Inc., 257 Wis.2d 511, 651 N.W.2d 738, 743-46 (Ct.App.2002) (holding that damage by defective component of integrated system to system as a whole or to other components is not "other property" damage which precludes economic loss doctrine; applying this holding to building construction defects, such as defect to windows).
Other courts have reached the same result as to what constitutes "other property" by looking to the product purchased by the plaintiff, as opposed to the product sold by the defendant. See, e.g., Easling v. Glen-Gery Corp., 804 F.Supp. 585, 590 (D.N.J.1992) (observing that where plaintiffs purchased completed apartment complex, not "a load of bricks," they could not pursue tort relief for damage caused by defective bricks to surrounding mortar or to other parts of building); Oceanside at Pine Point Condo. Owners Ass'n v. Peachtree Doors, Inc., 659 A.2d 267, 271 (Me. *202 1995) (holding that where plaintiffs purchased finished condominium units, not individual components of those units, any damages caused by defective windows constituted damage only to product itself, and precluded suit in tort); Casa Clara Condo. Ass'n, Inc. v. Charley Toppino & Sons, Inc., 620 So.2d 1244, 1247 (Fla.1993) (concluding that where homeowners purchased finished dwellings, not individual items of building materials, such as concrete, any damage caused to home by defective concrete was not recoverable in negligence action). Notably, the Casa Clara court refused to carve out an exception to the economic loss doctrine for homeowners, even though it recognized that buying a house was the largest investment that many consumers ever make. Casa Clara, 620 So.2d at 1247.
A minority of jurisdictions have held to the contrary. For example, in Stearman v. Centex Homes, 78 Cal.App. 4th 611, 622-23, 92 Cal.Rptr.2d 761 (2000), the California appellate court held that losses due to a defective foundation that caused slab movement and cracks throughout the exterior and interior surfaces of a home were recoverable in strict liability as "physical damage to property." Similarly, in Gunkel v. Renovations, Inc., 822 N.E.2d 150, 155-56 (Ind.2005), the Indiana Supreme Court held that the product sold to the plaintiffs was not the entire house on which a stone façade was installed, and the plaintiffs could seek a tort recovery for damage to the walls, ceilings, floors, drywall, and carpet caused by moisture problems from the defective façade. In Yacht Club II Homeowners Ass'n, Inc. v. A.C. Excavating, 94 P.3d 1177, 1181 (Colo.Ct. App.2003), the Colorado appellate court held that a negligence suit against a subcontractor for construction defects was not barred by the economic loss doctrine because subcontractors owed homeowners a duty of care, independent of any contract provision, in connection with construction of a home.
We conclude that the sounder view is expressed by us most recently in Marrone and the majority of jurisdictions that have addressed the critical issue. Here, plaintiffs purchased a house, not exterior siding, and the exterior siding was an integrated component of the finished product of that house.
Two critical issues become determinative. As both the United States Supreme Court in East River, our Supreme Court in Alloway as well as our decisions in Goldson v. Carver Boat Corp., 309 N.J.Super. 384, 396-98, 707 A.2d 193 (App.Div.1998), and most recently, Marrone, the policy supporting the economic loss rule requires consideration of the relative bargaining power of the parties as well as the ability of the parties to protect against the risk involved.
The economic loss rule "defines the boundary between the overlapping theories of tort law and contract law by barring the recovery of purely economic loss in tort, particularly in strict liability and negligence cases." R. Joseph Barton, Note, Drowning in a Sea of Contract: Application of the Economic Loss Rule to Fraud and Negligent Misrepresentation Claims, 41 Wm. & Mary L.Rev. 1789, 1789 (2000). The purpose of the rule is to "strike an equitable balance between countervailing public policies," that exist in tort and contracts law. Gennady A. Gorel, Note, The Economic Loss Doctrine: Arguing for the Intermediate Rule and Taming the Tort-eating Monster, 37 Rutgers L.J. 517, 524 (2006).
"Tort law, specifically product liability law, is based on a public policy concern that consumers need more protection from dangerous products than is afforded by the law of warranty." Gorel, supra, 37 Rutgers *203 L.J. at 525 (quotations omitted). Therefore, "a manufacturer may be in a better position to absorb the risk of loss from physical injury or property damage[.]" Alloway, supra, 149 N.J. at 628, 695 A.2d 264. Also, by holding manufacturers liable for loss from physical injury or property damage, "courts create a greater incentive for manufacturers to make safer products." Gorel, supra, 37 Rutgers L.J. at 526. On the other hand, the policy behind contract law "operates on the premise that contracting parties, in the course of bargaining for terms of a sale, are able to allocate risks and costs of the potential nonperformance. The underlying assumption is that the contract is the result of an arms-length negotiated transaction." Barton, supra, 41 Wm. & Mary L.Rev. at 1796. In that case, "a purchaser may be better situated to absorb the `risk of economic loss caused by the purchase of a defective product.'" Alloway, supra, 149 N.J. at 628, 695 A.2d 264, (quoting Spring Motors, supra, 98 N.J. at 576, 489 A.2d 660). See also East River, supra, 476 U.S. at 872-73, 106 S.Ct. at 2303, 90 L.Ed.2d at 878, (noting that "[c]ontract law, and the law of warranty in particular, is well suited to commercial controversies of the sort involved in this case because the parties may set the terms of their own agreements" and insure themselves against the risk of loss). Therefore, "[t]he increased cost to the public that would result from holding a manufacturer liable in tort for injury to the product itself is not justified." East River, supra, 476 U.S. at 872, 106 S.Ct. at 2303, 90 L.Ed.2d at 877. Furthermore, "[b]y refusing to extricate parties from the bargains that they have struck, the economic loss rule encourages parties to consider the possibility that the product will not perform properly and either assign risk or negotiate the price accordingly." Barton, supra, 41 Wm. & Mary L.Rev. at 1798.
Finally, allowing recovery for economic losses in a tort action would subject the manufacturer to unending liability. East River, supra, 476 U.S. at 874, 106 S.Ct. 2295 (noting that "[a] warranty action also has a built-in limitation on liability, whereas a tort action could subject the manufacturer to damages of an indefinite amount"). See also Alloway, supra, 149 N.J. at 633, 695 A.2d 264 (noting that "[a]llowing recovery for all foreseeable damages in claims seeking purely economic loss, could subject a manufacturer to liability for vast sums arising from the expectations of parties downstream in the chain of distribution"). "Such unending liability would decrease certainty and predictability in allocating risk, and thereby impede future business activity and contract negotiation." Barton, supra, 41 Wm. & Mary L.Rev. 1800.
Application of the policy supporting the economic loss rule supports barring the claim before us. As between plaintiffs as buyers and the Messinas as sellers, we discern no difference in bargaining power. As the subsequent purchasers of a home, plaintiffs had the opportunity to negotiate a contract, obtain a home inspection and to negotiate a final price with the sellers. In fact, their home inspection report notified them that they were purchasing a home that was clad in EIFS and that there could be problems with this product. At that point, plaintiffs could have done more research about the product. They were also free to walk away from the transaction or to insist that the sellers remediate the defect. We make no findings as to the merits of the factual issues in dispute between the parties but recognize that the parties had the distinct opportunity to fully protect their respective interests.
We recognize the thoughtful and well-articulated concerns expressed by our concurring *204 colleagues regarding the application of the economic loss rule as a bar to innocent purchasers recovering under the PLA from a manufacturer of a defective component of the home, where that component causes physical damage to other portions of the home; however, that is not the case we have before us on this appeal. As our concurring colleagues observe, plaintiffs, here, had appropriate opportunities to protect themselves from the potential of loss caused by the defective component. We would leave for another day and different factual scenario the critical issues raised in the concurring opinion.
Finally, we reject plaintiffs' argument that our recent decision in Boyle v. Ford Motor Co., 399 N.J.Super. 18, 942 A.2d 850 (App.Div.2008), mandates a different result. Boyle involved an accident in which the plaintiff was seriously injured when his car collided with a truck. The issue before us was whether the legal responsibility to install a safety device on the truck fell upon the manufacturer of a component product or the final-state manufacturer, and the economic loss doctrine was not an issue in the case.
Affirmed.
SABATINO, J.A.D., concurring in the judgment.
I fully endorse Judge Carchman's cogent analysis sustaining the dismissal of plaintiffs' claims against Sto under the Consumer Fraud Act, N.J.S.A. 56:8-1 to -184 ("CFA"). I also concur with the dismissal of the product liability claims in this particular case because of plaintiffs' knowing disregard of the potential risks of the EIFS sheathing in the premises before they took title to the house.
Nonetheless, I write separately to express concerns about the scope and application of the "economic loss" doctrine in circumstances involving a homeowner who, unlike the instant plaintiffs, is unaware of the latent risks of a defective component product that was used in the construction of his or her home. In my view, such an innocent home purchaser should be able to recover, under the Product Liability Act, N.J.S.A. 2A:58C-1 to -11 ("PLA"), reasonable compensation from the manufacturer of that defective component for the physical harm the component caused to other portions of the home and to any other property owned by the plaintiff.
More specifically, in such a products liability action against the component manufacturer, I do not consider the physical damage to other portions of the home as comprising injury to "the product itself" that is non-recoverable under the PLA and under the "economic loss" doctrine. Moreover, I do not read the prior opinions of our Supreme Court as foreclosing such potential strict liability of a component manufacturer to an innocent home purchaser.
Judge Carchman's scholarly opinion does an outstanding job in tracing the history of the economic loss doctrine and the distinctive policy considerations that underlie, on the one hand, contract law principles such as those codified in the Uniform Commercial Code ("U.C.C.") and, on the other hand, tort law principles of strict liability such as those embodied in the PLA. I recognize that in certain defined settings, such as a lawsuit by a commercial purchaser who has purchased a defective item, or an action by the buyer of chattel against the seller of those goods, our Supreme Court (as well as the courts in manybut not allother jurisdictions) holds that such plaintiffs are confined to their contractual and other non-tort remedies in pursuing damages, unless bodily injury is involved. I do not question those settled legal principles here.
*205 The present context, however, is one that has not yet been addressed by our Supreme Court. The context is one where: (1) the plaintiffs are the non-commercial purchasers of a home, not a good or chattel; (2) the products claim at issue is one asserted against the manufacturer of a component item installed in the home prior to plaintiffs' acquisition of the realty; and (3) plaintiffs seek compensation, beyond the repair and replacement of the defective component itself, for the physical damage caused to other portions of the structure that were neither made nor supplied by the defendant. The Court has yet to pronounce whether the economic loss doctrine shields a manufacturer of such a faulty component of a house from liability to an innocent consumer for the foreseeable physical damage to other portions of the house or to surrounding landscaping and property.
To be sure, in Spring Motors Distributors, Inc. v. Ford Motor Co., 98 N.J. 555, 561, 489 A.2d 660 (1985), the Court endorsed the economic loss doctrine in a context where a commercial buyer of fourteen trucks containing defective transmissions sought recovery for "repair, towing and replacement parts, as well as for lost profits and a decrease in the value of such trucks." The buyer sued the manufacturer of the trucks (Ford), the Ford dealership, and the company that had supplied the component transmissions (Clark). In the course of addressing that business setting, one in which the buyer had specifically negotiated to have the trucks fitted by Ford with the Clark transmissions, the Court observed that "the U.C.C. is the more appropriate vehicle for resolving commercial disputes arising out of business transactions between persons in a distributive chain." Id. at 571, 489 A.2d 660 (emphasis added).
The Court reasoned in Spring Motors that the economic loss doctrine should preclude consequential tort damages in such a business setting, in which the buyer and seller have an arms-length reciprocal opportunity to negotiate over warranties and other liability-allocation terms at the point of sale. Consequently, the Court held that "a commercial buyer seeking damages for economic loss only should proceed under the U.C.C. against parties in the chain of distribution." Id. at 578, 489 A.2d 660 (emphasis added). Hence, the Court reversed an order that permitted Spring Motors, as such a commercial plaintiff, to maintain an action in strict liability for economic loss. Id. at 579, 489 A.2d 660.
Although Spring Motors' warranty claims against the component manufacturer, Clark, were untimely under the U.C.C. statute of limitations, the Court nevertheless was persuaded that "the better rule [of law] is to restrict parties that are part of a single distributive chain to the U.C.C. in a suit for economic loss arising out of a commercial transaction." Id. at 582, 489 A.2d 660 (emphasis added). In his concurring opinion in Spring Motors, Justice Handler stressed the commercial nature of the transaction, the comparable bargaining power of the parties, and the buyer's sophistication in demanding that the truck manufacturer install the particular brand of transmission. Id. at 589-97, 489 A.2d 660.
The Justices in Spring Motors were particularly influenced by the California Supreme Court's opinion in Seely v. White Motor Co., 63 Cal.2d 9, 45 Cal.Rptr. 17, 403 P.2d 145 (1965), a case described in Spring Motors, 98 N.J. at 571-74, 489 A.2d 660, as representing the "majority view" of courts in other jurisdictions. In Seely, supra, the plaintiff bought from a dealer a truck, which he used in his hauling business. 45 Cal.Rptr. 17, 403 P.2d at 147. *206 One day the truck malfunctioned while rounding a corner, allegedly because of the engine "galloping" at the same time that the brakes failed, and the truck overturned. The plaintiff sued the dealer and manufacturer of the truck for economic damages, consisting of the lost profits of his business and the purchase price of the truck itself.
The California Supreme Court held that the plaintiff, despite his lack of privity with the truck manufacturer, could pursue contract-based damages against that manufacturer under the U.C.C. Id. at 148-49. However, the court rejected the buyer's alternative tort-based claims of strict liability because there were no bodily injuries involved and no property damage shown to be caused by the defendants' conduct. Id. at 152. Significantly, Chief Justice Traynor's majority opinion in Seely concludes with the following:

Plaintiff contends that, even though the law of warranty governs the economic relations between the parties, the doctrine of strict liability in tort should be extended to govern physical injury to plaintiff's property, as well as personal injury. We agree with this contention. Physical injury to property is so akin to personal injury that there is no reason to distinguish them. (See Prosser, supra, 69 Yale L.J. 1099, 1143; Rest.2d Torts (Tent. Draft No. 10), § 402 A); cf. Greenman v. Yuba Power Products, Inc., [59 Cal.2d 57, 27 Cal.Rptr. 697, 377 P.2d 897 (1963)]. In this case, however, the trial court found that there was no proof that the defect caused the physical damage to the truck. The finding of no causation, although ambiguous, was sufficient absent a request by plaintiff for a specific finding. (See Code Civ. Proc., § 634.) Since the testimony on causation was in conflict, the trial court's resolution of the conflict is controlling.
[Ibid. (emphasis added).]
Our own Supreme Court in Spring Motors, supra, recognized this causation deficiency in Seely. 98 N.J. at 572, 489 A.2d 660 ("[a]lthough the truck had been damaged, the court sustained a finding of the trial court that defendant[s] had not created the defect that caused the damage"). Thus, Seely, which was cited with approval in Spring Motors, did not foreclose a plaintiff from bringing a strict liability claim against a product manufacturer for "property damage," at least where causation is established.
Twelve years after Spring Motors, our Supreme Court decided Alloway v. General Marine Industries, L.P., 149 N.J. 620, 626, 695 A.2d 264 (1997), and extended the economic loss doctrine to a certain noncommercial transaction, namely, the purchase of a luxury power boat by a recreational boater. Three months after the sale, the boat sank in the marina, allegedly because of a defective seam in its interior swimming platform. The vessel's sinking did not cause anyone to sustain bodily injuries. The buyer, and his insurer, sued the company that had sold him the boat, Mullica, and also GMI, the corporate successor of the boat manufacturer. The plaintiffs did not sue the manufacturer of any component part within the boat. The plaintiffs' complaint rested upon three theories: (1) breach of contractual warranty, (2) strict products liability, and (3) negligence. Id. at 624, 695 A.2d 264. As a remedy, the plaintiffs sought the expenses the buyer incurred in repairing the boat, the difference between the boat's sale price and its market value in defective condition, attorneys fees, and costs. Ibid.
The Court concluded in Alloway that plaintiffs could not rely on theories of strict liability and negligence to recover "damages for economic loss resulting from a defect that caused injury only to the boat *207 itself." Id. at 626, 695 A.2d 264. In this regard, the Court defined "economic loss" to encompass "damages for costs of repair, replacement of defective goods, inadequate value, and consequential loss of profits." Id. at 627, 695 A.2d 264. Economic losses also include the diminution in the value of the product because of its inferiority and failure to meet the general purposes for which it was sold. Ibid. The Court found significant that plaintiffs "did not allege that other property was damaged or that anyone sustained personal injuries." Id. at 626-27, 695 A.2d 264.
Given the factual and procedural context in Alloway and the nature of the damages claimed, the Court ruled that, absent fraud, the buyer's appropriate recourse lied in contract-based remedies under the U.C.C. Id. at 638-43, 695 A.2d 264. The Court observed that "[g]enerally speaking, tort principles are better suited to resolve claims for personal injuries or damages to other property." Id. at 626-27, 695 A.2d 264. In making that observation, the Court cited, among other things, the California Supreme Court's opinion in Seely, as well as the United States Supreme Court's decision in East River S.S. Corp. v. Transamerica Delaval, 476 U.S. 858, 871, 106 S.Ct. 2295, 2302, 90 L.Ed.2d 865, 877 (1986).
East River held, as a matter of federal admiralty law, that the commercial purchasers of oil supertankers could not invoke tort theories of strict liability to recover economic losses from the maker of defective turbines installed in the tankers. The claimed losses in question were the costs of repairing the turbines and the income that the purchasers lost when those turbines failed. 476 U.S. at 859, 106 S.Ct. at 2296, 90 L.Ed.2d at 869.
Applying the economic loss doctrine in this plainly commercial setting, the United States Supreme Court noted in East River that there was no damage to "other property" involved. Rather, each turbine was supplied by the turbine manufacturer "as an integrated unit" and the defectively designed components damaged "only the turbine itself." 476 U.S. at 867, 106 S.Ct. at 2300, 90 L.Ed.2d at 874. The Court perceived no need under admiralty law to allow plaintiffs to pursue tort-based damages from the manufacturer where the product in question, i.e., each turbine sold by defendant, had "injured itself." In doing so, the Court explicitly recognized the commercial nature of the relationships before it:
The tort concern with safety is reduced when an injury is only to the product itself. When a person is injured, the "cost of an injury and the loss of time or health may be an overwhelming misfortune," and one the person is not prepared to meet. Escola v. Coca Cola Bottling Co., [24 Cal.2d 453, 150 P. 2d 436, 441 (1944)] (opinion concurring in judgment). In contrast, when a product injures itself, the commercial user stands to lose the value of the product, risks the displeasure of its customers who find that the product does not meet their needs, or, as in this case, experiences increased costs in performing a service. Losses like these can be insured. . . . Society need not presume that a customer needs special protection. The increased cost to the public that would result from holding a manufacturer liable in tort for injury to the product itself is not justified. Cf. United States v. Carroll Towing Co., 159 F.2d 169, 173 ([2d.] Cir.1947).
[East River, supra, 476 U.S. at 871-72, 106 S.Ct. at 2302, 90 L.Ed.2d at 877 (emphasis added).]
The Supreme Court went on to add:
We recognize, of course, that warranty and products liability are not static *208 bodies of law and may overlap. In certain situations, for example, the privity requirement of warranty has been discarded. E.g., Henningsen v. Bloomfield Motors, Inc., 32 N.J. 358, 380-384, 161 A.2d 69 [,81-84] (1960). In other circumstances, a manufacturer may be able to disclaim strict tort liability. See, e.g., Keystone Aeronautics Corp. v. R.J. Enstrom Corp., 499 F.2d 146, 149 ([3d.] Cir.1974). Nonetheless, the main currents of tort law run in different directions from those of contract and warranty, and the latter seem to us far more appropriate for commercial disputes of the kind involved here.

[East River, supra, 476 U.S. at 873 n. 8, 106 S.Ct. at 2302, 90 L.Ed.2d at 877 (emphasis added).]
The present case is unlike the circumstances in Spring Motors, Alloway, and East River. It is distinguishable from Spring Motors and East River because the Deans are not commercial purchasers, but rather individuals who bought a home for their personal use. They purchased real estate, not a chattel. Their ability to bargain with manufacturers is not comparable to that of the trucking company in Spring Motors, which insisted on the brand of component transmissions to be used in its fleet of trucks, or the shipping firms that contracted for the multi-million-dollar supertankers in East River. Their home purchase was simply not an equivalent commercial transaction.
Nor is the present case squarely on point with Alloway. Unlike Alloway, the products liability claim here is not pleaded against the party that made or sold the entire thing that plaintiffs bought, or that party's business successor. Rather, the claim is against the remote manufacturer of a component part, Sto. Moreover, Alloway involved the sale of a chattel, whereas the present case concerns the sale of real estate.
The Legislature has defined compensable harm under the PLA to include "physical damage to property, other than the product itself[.]" N.J.S.A. 2A:58C-1(b)(2)(a). Judge Carchman construes the house purchased by the Deans as the only "product" at issue here, and, accordingly, regards any physical harm to the house caused by the EIFS sheathing as damage to the "product itself." A similar approach was adopted by the panel in Marrone v. Greer & Polman Construction Inc., 405 N.J.Super. 288, 964 A.2d 330 (App.Div.2009). However, prior to Marrone, no published decision of our courts had ever classified a house as a "product" within the ambit of the PLA. The out-of-state cases relied upon in Marrone for that proposition, see id. at 300, 964 A.2d 330 did not involve a single-family house, but rather involved dwellings that are frequently mass-produced such as a trailer[1], a town house[2] and a condominium[3]. Although I confess to uncertainty on the point, I have considerable doubt that the *209 Legislature intended to treat a single-family house as a "product" when it enacted the PLA.[4]
On the other hand, the EIFS sheathing is unmistakably a "product." Indeed, "[t]he majority of courts hold that a defective product that is incorporated into an improvement to realty does not lose its identity as a product, and that a manufacturer or contractor may be strictly liable for any damages proximately caused by the defect." Restatement (Third) of Torts: Products Liability, supra, at § 19, Reporter's Note to comment e.[5] I favor that same generally-accepted approach, rather than deeming a component product used in a house as escaping the reach of strict products liability principles. I also should point out that our Supreme Court in Alloway, supra, 149 N.J. at 636-39, 695 A.2d 264, relied upon the then-proposed Third Restatement in its analysis of the economic-loss doctrine, albeit without discussing the Reporter's Note to Comment e of Section 19 relating to home construction.
Although the portion of the damages claimed by the Deans for repairing and replacing the defective sheathing itself is not compensable under the PLA, those aspects of the claim relating to physical damage to other components of the house are not, in my view, so categorically excluded. The economic loss rule has not been extended to those sorts of damages by our Supreme Court to date, at least in the context of a residence, as opposed to a good or a chattel.
In fact, prior to Marrone, we held that physical damage to other portions of a house caused by a defective component of a dwelling may subject the manufacturer of that component to strict liability for that kind of economic harm. We reached that conclusion in DiIorio v. Structural Stone & Brick Co., Inc., 368 N.J.Super. 134, 845 A.2d 658 (App.Div.2004), where defectively-manufactured stones installed in a house had caused physical damage to other portions of the house, to a deck, and to surrounding landscaping. Id. at 138, 845 A.2d 658. We noted in DiIorio that the plaintiff who purchased the home could not sue for those damages under the UCC because the UCC does not apply to realty transactions. Id. at 141, 845 A.2d 658. We found the UCC inapplicable to the transaction, even though the purchaser had some discussions before the home was built with the supplier of the stones. Id. at 142, 845 A.2d 658.
Judge Carchman points out that we characterized the transaction in DiIorio as "primarily one for the professional services of a builder in which the [defendant manufacturer] *210 supplied stone incidental to the contract for construction of residential premises." Id. at 137, 845 A.2d 658. Even so, we concluded in DiIorio that the component stone supplier was potentially liable for the buyer's economic losses under the common law and under statutes other than the UCC. Id. at 140-41, 845 A.2d 658. In the course of our analysis, we specifically rejected in DiIorio the notion that the PLA's exclusion for "harm to a product itself" foreclosed the plaintiff's claims for damage that the stones had caused to the other portions of the house, to the deck and the landscaping. Ibid. ("[t]he economic consequences were therefore not limited to the value of the stones themselves[.]").
By treating, for purposes of the PLA, a manufactured component part of a house as a product that is one and the same with the house itself, Marrone and Judge Carchman's opinion in this case divert from DiIorio in a troublesome direction. I would instead follow the course of DiIorio and what the Third Restatement describes as the dominant view of other states, by treating such component parts as discrete products that are subject to potential strict liability under the common law and products liability statutes. Restatement (Third) of Torts: Products Liability, supra, at § 19, Reporter's Note to comment e.
A manufacturer of a mass produced item such as EIFS sheathing, who places such products into the stream of commerce, is presumptively in the best position to be aware of defects in its wares, and to guard against such defects. I discern no policy justification to adopt a per se rule that, in effect, insulates such component manufacturers from the foreseeable physical damage that their products cause to other portions of a home in which they are installed, particularly where the defect is latent. For example, if a second-floor bathroom pipe bursts because of a defective sealant used in the construction, the injured homeowner should have recourse, under the strict liability principles of the PLA, to recover damages from the sealant manufacturer for the physical harm to the first-floor ceiling, hardwood floors, and beams that were saturated when the sealant failed and water infiltrated those other portions of the house.
In the present case, however, we are not dealing with such an entirely latent defect, but one that was pointed out to the Deans, both orally and in writing, by their astute home inspector before they purchased the house. I agree with Judge Carchman that, whatever the proper scope of the economic loss doctrine may be, tort principles should not cover those losses in the particular setting of this transaction. Once alerted to the potential risks of the sheathing, the Deans could have insisted on a warranty from the builder to guard against future consequential harms, or demanded that the sheathing be replaced, or walked away from the purchase altogether. They did none of those things. The defect in the EIFS was no longer, with respect to the Deans, latent. Given this particular transactional context, I have no problem in confining plaintiffs to other remedies that are not based in tort or under the PLA.
With these doctrinal caveats in mind, I concur in the court's disposition affirming summary judgment in favor of Sto.
Judge SIMONELLI joins in this concurring opinion.
NOTES
[1] For ease of reference, we will refer to the individual plaintiffs by their first names.
[2] Other defendants were named in the action but the appeal is limited to the claims against defendant Sto Corp. According to plaintiffs' brief, plaintiffs have entered into settlement agreements with the other defendants. Our references to defendant, refer only to Sto unless otherwise indicated.
[3] According to Restatement (3d) of Torts: Products Liability § 21 (1998), economic loss includes harm to: "(a) the plaintiff's person; or (b) the person of another when harm to the other interferes with an interest of the plaintiff protected by tort law; or (c) the plaintiff's property other than the defective product itself."

Similarly, N.J.S.A. 2A:58C-1(b)(2) defines harm as:
(a) physical damage to property, other than to the product itself; (b) personal physical illness, injury or death; (c) pain and suffering, mental anguish or emotional harm; and (d) any loss of consortium or services or other loss deriving from any type of harm described in subparagraphs (a) through (c) of this paragraph.
[4] For collected cases, see J.M. Zitter, Annotation, Strict Products Liability: Recovery for Damage to Product Alone, 72 A.L.R.4th 12 (1989).
[5] The holding in Calloway was subsequently superseded by statute. Olson v. Richard, 120 Nev. 240, 89 P.3d 31, 33 (2004).
[1] See Waggoner v. Town & Country Mobile Homes, 808 P.2d 649, 653 (Okla.1990)(rejecting mobile home purchasers' tort actions against manufacturer for costs of repair and lost value resulting from defective roof design, when the damage was to only the mobile home itself, and holding that the claim would be more properly made in a warranty action).
[2] See Morris v. Osmose Wood Preserving, 99 Md.App. 646, 639 A.2d 147 (1994) (rejecting townhome owners' tort claims against plywood manufacturer for gradual deterioration of plywood in roofs because such damage constituted economic loss), aff'd in part, rev'd in part, 340 Md. 519, 667 A.2d 624 (1995).
[3] See Oceanside at Pine Point Condominium Owners Ass'n v. Peachtree Doors, 659 A.2d 267 (Me. 1995) (rejecting condominium association's and individual condominium owners' tort claims that sought recovery of economic loss caused by water damage around windows).
[4] See also Restatement (Third) of Torts: Products Liability § 19 (1998), cmt. e (noting that "[t]raditionally, courts have been reluctant to impose products liability on sellers of improved real property in that such property does not constitute goods or personalty," although recently some courts have extended such liability to sellers of prefabricated homes and large housing projects, and concerning built-in equipment attached to the real estate).
[5] See, e.g., Berman v. Watergate West, Inc., 391 A.2d 1351 (D.C.1978) (air conditioning system); Pamperin v. Interlake Cos., 634 So.2d 1137 (Fla.Dist.Ct.App.1994) (storage rack system); Halpryn v. Highland Ins. Co., 426 So.2d 1050 (Fla.Dist.Ct.App.1983) (paint on driveway); Trent v. Brasch Mfg. Co., 132 Ill.App.3d 586, 87 Ill.Dec. 784, 477 N.E.2d 1312 (1985) (heating, ventilating, and air-conditioning system); O'Laughlin v. Minnesota Natural Gas Co., 253 N.W.2d 826 (Minn. 1977) (grate of gas floor furnace); Trustees of Columbia University v. Exposaic Industries, Inc., 122 A.D.2d 747, 505 N.Y.S.2d 882 (1986) (concrete panels); Worrell v. Barnes, 87 Nev. 204, 484 P.2d 573 (1971) (fitting in water-heater); Smith v. Fluor Corp., 514 So.2d 1227 (Miss.1987) (heat exchanger); Brokenshire v. Rivas and Rivas, Ltd., 142 Or.App. 555, 922 P.2d 696 (1996) (defendant who installed acrylic floor in bakery was strictly liable for supplying a saleservice "hybrid").