8 A.3d 766

ROBERT R. DEAN, JENNIFER P. DEAN AND MARY SUE DEAN, PLAINTIFFS–APPELLANTS, v. BARRETT HOMES, INC., LINCOLN WOOD PRODUCTS, INC., STO OF NEW JERSEY, INC., STO EASTERN, INC., ARCHITECTURAL EXTERIOR FINISHES, INC., AND HOUSEMASTER, INC., DEFENDANTS, AND STO CORP., DEFENDANT–RESPONDENT.

Argued January 5, 2010—Decided November 15, 2010.

*Peter L. Davidson* argued the cause for appellants (*The Davidson Legal Group,* attorneys).

*Andrew P. Fishkin* argued the cause for respondent (*Edwards Angell Palmer & Dodge,* attorneys; *Mr. Fishkin, David N. Cohen,* and *Charles W. Stotter,* on brief).

*John Randy Sawyer* submitted a brief on behalf of amicus curiae Homeowners Against Deficient Dwellings (*Stark & Stark,* attorneys; *Mr. Sawyer* and *Joseph D. Gumina,* on the brief).

*Anita R. Hotchkiss* submitted a brief on behalf of amicus curiae Product Liability Advisory Council, Inc. (*Goldberg Segalla,* attorneys; *Ms. Hotchkiss* and *Sarah X. Fang,* on the brief).

Justice HOENS delivered the opinion of the Court.

The Products Liability Act, *N.J.S.A.* 2A:58C–1 to –11, established a unified theory of recovery for harm caused by products. In enacting that statute, our Legislature carefully defined the kinds of harm needed to support a recovery, specifically embracing a long standing common law theory known as the economic loss rule. *N.J.S.A.* 2A:58C–1(b)(2). In this appeal, we consider the continuing viability of the economic loss rule and its applica-

tion to a claim arising out of the purchase of a residence, from its original owners, which had been constructed with an allegedly defective exterior finishing system. That context sets this case apart from our existing jurisprudence, in which we considered the remedies available to direct purchasers of products. This dispute, by distinguishing secondary purchasers from those with clearly available contract remedies against the manufacturer of the allegedly defective product, thus presents the question of whether, and in what circumstances, those remote purchasers should be permitted to pursue a tort remedy against that manufacturer.

This appeal also calls upon the Court to consider whether we will adopt the integrated product doctrine, devised in the federal courts, as a corollary to the economic loss rule. Were we to do so, and were we to conclude that the exterior finishing system is indeed integrated into the home itself, the effect would be to preclude these plaintiffs, and any other similarly situated home purchaser, from pursuing products liability relief against the manufacturer of an allegedly defective product affixed or adhered to the outside of the home for damage done by the product to the home.

Our consideration of these questions, and of the policies expressed by our Legislature in the governing statute, compels us to conclude that the integrated product doctrine does not apply to the facts before this Court, but that the economic loss rule limits plaintiffs' recovery to damage to the structure other than that sustained by the exterior finishing system itself. We therefore reverse and remand this matter to the Law Division for further proceedings.

## I.

Many of the facts relevant to this appeal are contained in the Appellate Division's published majority and concurring opinions, see *Dean v. Barrett Homes, Inc.*, 406 *N.J.Super.* 453, 968 *A.*2d 192 (App.Div.2009), as a result of which we will set forth only those facts necessary to explain our decision. Plaintiffs Robert, Jenni-

fer, and Mary Sue Dean purchased a home in 2002 from its original owners. *Id.* at 455, 968 *A.*2d 192. The home had been built in 1995 by defendant Barrett Homes, Inc., with an Exterior Insulation and Finish System (EIFS), which was designed and manufactured by defendant Sto Corporation (Sto). *Ibid.* Traditional EIFS, the kind featured on the Deans' home, is sometimes called synthetic stucco. It consists of an adhesive, an expanded polystyrene board, a ground coating with reinforcing fiberglass fabric, a primer, and a synthetic plaster finish coating. *Id.* at 457, 968 *A.*2d 192. When it is affixed to the exterior of a building, EIFS operates as a combined insulation and wall finish system.

Prior to the closing, plaintiffs hired defendant HouseMaster, Inc. to perform a home inspection. *Id.* at 456, 968 *A.*2d 192. The inspection report raised questions concerning the EIFS and recommended that plaintiffs follow up with an expert or the product's manufacturer before proceeding with their purchase. *Id.* at 456–57, 968 *A.*2d 192. Plaintiffs, however, did not read the report prepared by HouseMaster and did not make the inquiries that report suggested. *Ibid.* At about the same time, plaintiffs learned that their insurer would not transfer their existing homeowner's policy to the new property, purportedly because the insurer would not cover a stucco exterior. *Id.* at 456, 968 *A.*2d 192. Undeterred, and without any further investigation of the EIFS, plaintiffs obtained insurance from another carrier, proceeded with the purchase, and moved into the home in May 2002. *Id.* at 457, 968 *A.*2d 192.

Plaintiffs assert that approximately one year after moving in, they first noticed black lines on the exterior of their home and thought that there might be a problem with the home's finishing system. *Ibid.* Plaintiffs assert that they then began to investigate and learned that if moisture penetrates through the EIFS, it has no means of escape. *Id.* at 457–58, 968 *A.*2d 192. Moisture penetrating the EIFS therefore becomes trapped behind it and eventually causes the underlying structure to rot or to develop mold. *Id.* at 458, 968 *A.*2d 192. They further assert that they

hired an industrial hygienist, who inspected their home and found toxic mold that he blamed on leaks in the EIFS. *Ibid.* Although plaintiffs have never claimed that they sustained any personal injuries caused by the mold, they eventually had all of the EIFS removed and replaced. *Ibid.*

Plaintiffs believe that EIFS is defective because it lacks a "secondary weather protection behind the cladding to protect the underlying moisture sensitive substrate" and has "no means of drainage of water which may penetrate the wall assembly." *Ibid.* Moreover, they assert that it is virtually inevitable that water will penetrate the EIFS because moisture can enter through any break in the EIFS, including window cracks, holes created during cable installation, or failed sealing joints.

In May 2004, plaintiffs filed their complaint, in which they asserted claims against several defendants sounding in negligence, breach of express and implied warranties, breach of contract, Consumer Fraud Act violations, common law fraud, and strict products liability. *Id.* at 459, 968 *A.*2d 192. Eventually, plaintiffs resolved their claims against all of the defendants except Sto.

Following discovery, defendant Sto moved for summary judgment. *Ibid.* In granting that motion, the motion court rejected plaintiffs' products liability claim against defendant Sto, because plaintiffs were seeking damages for purely economic losses. *Ibid.* That is, the motion court reasoned that although plaintiffs claimed that the EIFS was defective, they sought to recover the cost of replacing it, resulting in a claim that was statutorily barred. *Ibid.* Because neither plaintiffs nor anyone else had sustained an injury attributable to the product's claimed defect, the court concluded that there was no basis to support any tort theory of recovery. *Ibid.*

Plaintiffs appealed, arguing that the trial court erred by invoking the economic loss rule and asserting that their products liability claim should be permitted to proceed because they had no alternate contract remedy available. *Ibid.* The Appellate Division affirmed the trial court's grant of summary judgment, rejecting

that argument, along with another statutory claim plaintiffs had raised, which is not germane to this appeal. *See id.* at 455, 968 A.2d 192.

Concerning the products liability claim, Judge Carchman, writing for the appellate panel, concluded that the economic loss rule precluded recovery because plaintiffs' claim for damages was focused on the cost of replacing the defective product itself. *Id.* at 467, 472, 968 A.2d 192. As part of its analysis, the court traced the development of the common law economic loss rule, reasoning that it was designed to disallow a tort-based products liability claim if the parties could have addressed their dispute on contract grounds. *Id.* at 463–66, 968 A.2d 192. The court also considered whether a tort-based theory of recovery should be available where a defective building component damages other parts of the building's structure, concluding that the integrated product doctrine, which would preclude that relief, is consistent with this Court's precedents. *See id.* at 467–68, 470, 968 A.2d 192. Although recognizing that its approach would foreclose all of plaintiffs' potential remedies against the EIFS manufacturer, the Appellate Division concluded that the economic loss rule and the integrated product doctrine equitably and appropriately balance the different policies served by tort and contract law. *Id.* at 470, 968 A.2d 192.

Two members of the appellate panel filed a concurring opinion, in which they agreed with the ultimate outcome as to plaintiffs' claim, but argued for a different policy approach. *Id.* at 473, 968 A.2d 192 (Sabatino, J., concurring). They framed the issue as being "whether the economic loss doctrine shields a manufacturer of . . . a faulty component of a house from liability to an innocent consumer for the foreseeable physical damage to other portions of the house or to surrounding landscaping and property." *Id.* at 474, 968 A.2d 192. The concurring panelists essentially argued that the integrated product doctrine should be rejected, so that truly innocent home purchasers would be permitted to recover in tort from the manufacturer of a defective component product for damages to the home other than to the product itself. *Id.* at 483,

968 *A*.2d 192. They concluded, however, that plaintiffs would have no such cause of action, reasoning that they could not qualify as innocent purchasers because the information revealed in the home inspection report gave them sufficient opportunities to protect themselves from the risk of loss. *Ibid.*

We granted plaintiffs' petition for certification, 200 *N.J.* 207, 976 *A*.2d 384 (2009), and we granted leave to Homeowners Against Deficient Dwellings and the Product Liability Advisory Council, Inc., to appear as amici curiae.

## II.

In their petition for certification, plaintiffs assert that this matter raises three issues that this Court should address. First, they ask us to consider whether a house qualifies as a "product" for purposes of relief available under the Products Liability Act, reasoning that if it does not, then the Appellate Division's application of the integrated product doctrine to deny them a recovery conflicts with the Act and cannot be sustained.

Second, plaintiffs argue that damage to their home resulting from the EIFS meets the Act's definition of harm and that the Appellate Division erred when it applied the economic loss rule to them. More specifically, they assert that because their claim arose in a non-commercial setting, and because the EIFS is a product with a latent defect, the economic loss rule should not apply at all.

Finally, plaintiffs ask us to consider whether the differences between tort and contract remedies that effectuate the goals of risk and loss allocation are fairly served by applying the economic loss rule to them. Because, in their view, there is no legislative remedial scheme sounding in contract that addresses their circumstances, they argue that this Court should use the existing tort-based remedy embodied in the Products Liability Act to create one.

Defendant argues that the trial court and the Appellate Division correctly granted its motion for summary judgment and refutes each of plaintiffs' three points as being insufficient to warrant relief. First, defendant asserts that the economic loss rule applies to plaintiffs' claim and urges this Court to embrace the integrated product doctrine devised by the federal courts to conclude that because the product only caused damage to itself, it is not compensable in tort.

Second, defendant argues that applying the economic loss rule and the integrated product doctrine to plaintiffs would not foreclose them or similarly situated individuals from recovering. Instead, ordinary warranty and other contract remedies were and are available to a purchaser in plaintiffs' circumstances and would be more appropriate to address the product's alleged shortcomings.

Finally, defendant urges this Court not to lose sight of the fact that plaintiffs had ample opportunities to address the claimed defects in the EIFS prior to their purchase of the home, but failed to pursue any of them. Defendant argues that it would be both unfair and unwise for this Court to excuse that failure by crafting an exception to the tort-based remedial scheme that our Legislature so carefully embodied in the Products Liability Act.

## III.

The issues raised by the parties require an analysis of the Products Liability Act. As we have noted, in enacting the Products Liability Act, our Legislature established "one unified, statutorily defined theory of recovery for harm caused by a product, and that theory is, for the most part, identical to strict liability." *In re Lead Paint Litig.*, 191 *N.J.* 405, 436, 924 *A.*2d 484 (2007) (internal quotation and citation omitted).

The definition of tort liability found in the Products Liability Act is broad: "[a] manufacturer or seller of a product shall be liable in a product liability action only if the claimant proves by a preponderance of the evidence that the product causing the harm

was not reasonably fit, suitable or safe for its intended purpose...." *N.J.S.A.* 2A:58C-2. Although broad in scope, it is significant for this dispute that the statute defines harm, and does so in terms that are specific. Harm for which there can be compensation under the Act, by definition, is limited to "physical damage to property, *other than the product itself*[,]" and certain personal injuries. *N.J.S.A.* 2A:58C-1(b)(2) (emphasis added).

That definition of harm was not a new one, for it represented a codification of the economic loss rule. Understanding that rule and its analytical underpinnings is essential to any analysis of the statute. The economic loss rule, which bars tort remedies in strict liability or negligence when the only claim is for damage to the product itself, evolved as part of the common law, largely as an effort to establish the boundary line between contract and tort remedies. As this Court long ago noted, the economic loss rule was developed in conjunction with strict liability theories that were "a judicial response to inadequacies in sales law with respect to consumers who sustained physical injuries from defective goods made or distributed by remote parties in the marketing chain." *Spring Motors Distribs., Inc. v. Ford Motor Co.*, 98 *N.J.* 555, 576, 489 *A.*2d 660 (1985). Subsequent to the development of the doctrine, most of the protections for commercial transactions were established through the adoption of the Uniform Commercial Code (U.C.C.), *see N.J.S.A.* 12A:1–101 to:12–26. The U.C.C. effectively supplanted strict liability as the mechanism for consumer protection, at least in the context of commercial transactions. *See* W. Prosser & W. Page Keeton, *Handbook of the Law of Torts* § 95A at 680 (5th ed. 1984).

It was in that context that this Court adopted the economic loss rule, initially analyzing the rule as it applied to a large-scale commercial transaction between sophisticated purchasers. *See Spring Motors, supra*, 98 *N.J.* at 560, 578–79, 489 *A.*2d 660. The Court held that commercial buyers "seeking damages for economic loss resulting from the purchase of defective goods may recover from an immediate seller and a remote supplier in a distributive

chain for breach of warranty under the U.C.C., but not in strict liability or negligence." *Id.* at 561, 489 *A.*2d 660. In part, that result rested on the view that, as between parties to a commercial transaction seeking recovery for a defect in the product itself, the U.C.C. was a "comprehensive system for determining the rights and duties of buyers and sellers with respect to contracts for the sale of goods." *Id.* at 565, 489 *A.*2d 660. The Court referred to the U.C.C. as the "*exclusive source* for ascertaining when a seller is subject to liability for damages if the claim is based on intangible economic loss not attributable to physical injury to person or harm to a tangible thing other than the defective product itself." *Id.* at 581, 489 *A.*2d 660 (quoting Prosser & Keeton, *supra,* § 95A at 680) (internal quotation omitted). That is to say, if the essence of a claim was that there was something wrong with the product itself, the buyer's remedies were found in the U.C.C. because the claim was based, fundamentally, on the contract principles embodied there.

The *Spring Motors* Court looked to the underlying policies differentiating tort remedies from contract remedies, noting:

> [T]ort principles, such as negligence, are better suited for resolving claims involving unanticipated physical injury.... Contract principles, on the other hand, are generally more appropriate for determining claims for consequential damage that the parties have, or could have, addressed in their agreement.
>
> [*Id.* at 579–80, 489 *A.*2d 660.]

In other words, the Court concluded that when addressing economic losses in commercial transactions, contract theories were better suited than were tort-based principles of strict liability. This Court's approach was embraced by the United States Supreme Court soon thereafter, *see E. River S.S. Corp. v. Transamerica Delaval Inc.,* 476 *U.S.* 858, 871, 106 *S.Ct.* 2295, 2302, 90 *L.Ed.*2d 865, 877 (1986), but again, the analysis arose in the context of a commercial transaction between sophisticated business entities. In adopting the economic loss rule, the United States Supreme Court described it as springing from the proposition that commercial purchasers cannot hold manufacturers responsible, through principles of negligence or strict liability, for

failure "to prevent a product from injuring itself." *Ibid.* (considering federal admiralty law and finding tort remedies inapplicable where defective turbines damaged oil supertankers).

This Court subsequently extended the economic loss rule beyond transactions between sophisticated commercial entities, by applying it to transactions involving individual consumers. *See Alloway v. Gen. Marine Indus., L.P.*, 149 *N.J.* 620, 641, 695 *A.*2d 264 (1997). There, in considering the claim of a purchaser of an allegedly defective boat who sought to recover the cost of repairs or lost trade-in value, the Court concluded that the U.C.C. "amply protects all buyers—commercial purchasers and consumers alike—from economic loss arising out of the purchase of a defective product." *Id.* at 642, 695 *A.*2d 264.

This Court's analysis reflects an effort to identify the demarcation line between contract and tort remedies, and to do so by considering questions about the allocation of risk and loss. In *Alloway*, the Court made that choice by identifying factors that helped determine which theory, tort or contract, better addressed the claim being asserted, and by considering: (1) the relative bargaining power of the parties; (2) the risk-of-loss allocation implications; and (3) the availability of insurance. *Id.* at 628–29, 695 *A.*2d 264.

In applying those factors, the *Alloway* Court found that the plaintiff had the resources to purchase a luxury item, was not at a disadvantage when bargaining for its purchase, and could insure himself against the risk of loss. *Id.* at 629, 695 *A.*2d 264. Further, the Court reasoned that a host of statutory contractual remedies adequately protect such consumers against economic losses. *Id.* at 639–41, 695 *A.*2d 264 (citing U.C.C., *N.J.S.A.* 12A:1–103; Consumer Fraud Act, *N.J.S.A.* 56:8–1 to –20; Truth–In–Consumer Contract, Warranty and Notice Act, *N.J.S.A.* 56:12–1 to –18; and Magnuson–Moss Warranty Act, 15 *U.S.C.A.* §§ 2301–2312). In those circumstances, we described a tort remedy as "superfluous and counterproductive." *Id.* at 641, 695 *A.*2d 264.

In enacting the Products Liability Act, and in codifying the economic loss rule within the definition of the "harm" found in the Act's general provision, *N.J.S.A.* 2A:58C–1(b)(2), the Legislature both recognized and agreed with its designation of the line that divides tort and contract remedies. The economic loss rule is therefore firmly established as a limitation on recovery through tort-based theories, not only because of this Court's longstanding common law precedents differentiating between remedies sounding in tort and contract, but also through the pronouncement of our Legislature as embodied in the Products Liability Act.

In recent years, federal courts, including the United States Court of Appeals for the Third Circuit, have begun to expand the economic loss rule through the adoption of an approach referred to as the integrated product doctrine. In short, federal courts have used this theory to extend the economic loss rule to preclude tort-based recovery when a defective product is incorporated into another product which the defective product then damages. *See, e.g., King v. Hilton–Davis,* 855 *F.*2d 1047, 1051 (3d Cir.1988) (applying Pennsylvania law; concluding that potato starter fungicide was integrated into potato starters, precluding tort claim for crop failure), *cert. denied,* 488 *U.S.* 1030, 109 *S.Ct.* 839, 102 *L.Ed.*2d 971 (1989). By focusing on whether the defective product was integrated into a larger one, the federal courts have concluded that "harm to the product itself" means harm to whatever else the defective product became integrated into. *Ibid.*

Although the Third Circuit originally used the integrated product doctrine in a case arising under Pennsylvania law, *see ibid.,* more recently, federal courts have employed that theory when called upon to apply New Jersey law as well. *See, e.g., Int'l Flavors & Fragrances, Inc. v. McCormick & Co., Inc.,* 575 *F.Supp.*2d 654, 662–63 (D.N.J.2008) (explaining that "damage done to a final product by a defective component or ingredient does not constitute damage to property 'other than to the product itself.' "); *Travelers Indem. Co. v. Dammann & Co., Inc.,* 592 *F.Supp.*2d 752, 762–63 (D.N.J.2008) (barring Products Liability Act claim because

defective vanilla beans were incorporated into vanilla extract and other flavorings); *Easling v. Glen–Gery Corp.*, 804 *F.Supp.* 585, 590–91 (D.N.J.1992) (rejecting apartment complex purchaser's Products Liability Act claim for damaged studs and interiors caused by defective brick facing because the product was not bricks, but the completed apartment complex); *cf. In re Merritt Logan, Inc.*, 901 *F.*2d 349, 362 (3d Cir.1990) (precluding tort claim against manufacturer of defective refrigeration system by concluding that damage to food that spoiled was damage of the kind bargained for in commercial transaction).

Our appellate courts have also begun to consider whether to recognize and apply the integrated product doctrine here in New Jersey. Although the decision now before us represents one analysis of the theory, it is not the first. Another appellate panel previously considered and applied the integrated product doctrine to bar a homeowner's claim for recovery arising from an EIFS exterior that had damaged portions of the home. *See Marrone v. Greer & Polman Constr., Inc.*, 405 *N.J.Super.* 288, 302–03, 964 *A.*2d 330 (App.Div.2009). Considering facts nearly identical to the ones that are now before us, that earlier panel rejected the Products Liability Act claims for consequential damages involved in replacing the EIFS. *Id.* at 304, 964 *A.*2d 330. That panel, applying the integrated product doctrine, reasoned that "the house is the 'product,' and it cannot be subdivided into its component parts for purposes of supporting a [Products Liability Act] cause of action." *Id.* at 297, 964 *A.*2d 330.

The *Marrone* court concluded that the EIFS was not separate from the house, but was integrated into it, therefore making the EIFS and the house one "product" for purposes of the Act's definition of harm. *Ibid.* That led the court to conclude that any damage the EIFS caused to the structure of the house was damage to the "product" itself, with the result that plaintiff was barred from recovery by the economic loss rule. *Ibid.* Moreover, the *Marrone* panel reasoned that even if the plaintiff had bought the EIFS separately, the costs of removing and replacing the

EIFS could not be recovered pursuant to the Products Liability Act. *Ibid.* In those circumstances, the claim would be barred because "defects in the [EIFS] cladding constitute 'damage ... to the product itself.' " *Ibid.* (quoting *N.J.S.A.* 2A:58C–1(b)(2)).

Although an earlier decision appeared to reach a contrary conclusion, *see DiIorio v. Structural Stone & Brick Co.,* 368 *N.J.Super.* 134, 845 *A.*2d 658 (App.Div.2004) (affirming denial of summary judgment on tort claim against remote supplier of defective stone façade), the *Marrone* court distinguished that precedent by interpreting it to have been a dispute alleging builder malpractice rather than one about defective goods. *Marrone, supra,* 405 *N.J.Super.* at 303, 964 *A.*2d 330. That analysis finds support in the *DiIorio* decision, which arose out of the agreement of the parties for the construction of residential premises. *DiIorio, supra,* 368 *N.J.Super.* at 136, 845 *A.*2d 658. In *DiIorio,* the court concluded that the transaction fell outside of the U.C.C. because it involved the sale of real property or of services rather than goods. *Id.* at 141–42, 845 *A.*2d 658. But in addressing the buyer's claim that a stone façade was defective and had damaged other parts of the home as it flaked off, the *DiIorio* court declined to apply either the integrated product doctrine or the economic loss rule. Instead, the panel reasoned that the purchaser could proceed against the builder on a professional negligence theory, thus taking the claim outside of both the U.C.C. and the Products Liability Act. *Ibid.*

It is against this historical and analytical background that we consider the questions presented by plaintiffs in their petition for certification.

## IV.

This appeal presents us with challenges on two levels. On its surface, the dispute is about whether we will adopt the integrated product doctrine and, if so, whether the EIFS was sufficiently integrated into the home plaintiffs purchased that any recovery for damages to it or to the home is barred by the economic loss

rule. Deciding that question, however, calls upon this Court to consider fundamental issues about the roles played by contract and tort in addressing defective products and in affording a remedy for the losses that are caused by or flow from them.

■ The three questions presented in plaintiffs' petition for certification are sufficiently intertwined that we need not address them separately. We begin with the argument about whether a house qualifies as a "product" for purposes of relief available under the Products Liability Act, *N.J.S.A.* 2A:58C–1 to –11. Plaintiffs argue that because the Act specifically excludes a seller of real estate from its definition of a "product seller," *N.J.S.A.* 2A:58C–8 (providing that "product seller" does not include a seller of real property), then all claims relating to houses fall outside of the Act. Plaintiffs further reason that, if a house is not a product within the meaning of the Act, then the Appellate Division's use of the integrated product doctrine to deny them a recovery conflicts with the Act and cannot be sustained.

Although plaintiffs present the argument as part of their attack on the Appellate Division's application of the integrated product doctrine, in actuality it rests on a flawed reading of the Act's definition of harm. Regardless of whether the Legislature considered a home to be a product when it excluded sellers of real estate from the definition of product sellers, one can easily conceive of circumstances in which a house would not only qualify as a product, but would also create a compensable cause of action in tort. A prefabricated home that gave off fumes and sickened its residents, for example, would certainly qualify. *See, e.g., Schipper v. Levitt & Sons, Inc.,* 44 *N.J.* 70, 92–93, 207 *A.*2d 314 (1965) (explaining certain tort remedies available against builder of home with defective water distribution system that scalded child inhabitant); *see also McDonald v. Mianecki,* 79 *N.J.* 275, 291–93, 398 *A.*2d 1283 (1979) (explaining *Schipper* and permitting warranty remedy against builder-vendors of home with defective well and water system). In this appeal, however, plaintiffs purchased the home from its prior owners, not from a product seller or manufac-

turer, thus making plaintiffs' argument about whether a house might be a product misplaced. The issue is not whether a home is a product, but whether this Court will adopt the integrated product doctrine to address whether a product, like EIFS, which causes damages to the house, falls within the economic loss rule, thus barring recovery.

Our response to that question is a limited one. Whether we adopt the integrated product doctrine or not, it would not alter the outcome here, because our analysis turns on whether the EIFS was sufficiently integrated into the home to become a part of the structure for purposes of broadly applying the economic loss rule. Deciding whether one product is sufficiently integrated into another for purposes of applying the doctrine is a significant undertaking. The doctrine is referred to in the *Restatement (Third) of Torts: Product Liability* § 21, in a comment relating to the economic loss rule generally. *Restatement, supra,* § 21 comment e (observing generally that if component part causes damage to product and if the product "is deemed to be an integrated whole, courts treat such damage as harm to the product itself"). Particularly in the case of houses, a product that is merely attached to or included as part of the structure is not necessarily considered to be an integrated part thereof.

The *Restatement* points out, for example, that asbestos has not been deemed to be an integrated product, but instead that "most courts have taken the position that contamination constitutes harm to the building as other property." *Ibid.; see, e.g., Tioga Pub. Sch. Dist. # 15 v. United States Gypsum Co.,* 984 *F.*2d 915, 918 (8th Cir.1993) (permitting recovery through tort for costs of asbestos abatement); *Northridge Co. v. W.R. Grace & Co.,* 162 *Wis.*2d 918, 471 *N.W.*2d 179, 185–86 (1991) (same); *Kershaw County Bd. of Educ. v. United States Gypsum Co.,* 302 *S.C.* 390, 396 *S.E.*2d 369, 371 n. 1 (1990) (holding school to be other property so as to allow recovery for costs of asbestos abatement).

Similarly, the courts in California have declined to apply the integrated product doctrine to products used in building houses.

The California Supreme Court has held that "the economic loss rule does not necessarily bar recovery in tort for damage that a defective product . . . causes to other portions of a larger product . . . into which the former has been incorporated." *Jimenez v. Superior Court*, 29 Cal.4th 473, 127 *Cal.Rptr.*2d 614, 58 *P.*3d 450, 457 (2002). Applying that view, the court permitted plaintiff home buyers to recover in strict liability for damage that the windows caused to other parts of the home, rejecting the argument that the windows were integrated into the home for purposes of the rule. *Id.* at 483–84, 127 *Cal.Rptr.*2d 614, 58 *P.*3d 450. An intermediate appellate court in California, rejecting arguments similar to the ones advanced before this Court as "intellectual nit-picking," *Stearman v. Centex Homes*, 92 *Cal.Rptr.*2d 761, 769, 78 *Cal.App.* 4th 611, 623 (Cal.Ct.App.2000), concluded that the integrated product doctrine did not preclude plaintiffs from recovery for damages to their house caused by a faulty foundation. *Ibid.*

We reach the same conclusion in this appeal. As we understand it, the EIFS was affixed to the exterior walls to create a moisture barrier, much like exterior vinyl siding. As such, it did not become an integral part of the structure itself, but was at all times distinct from the house. It remained, therefore, a separate product for purposes of our analysis. That conclusion, however, would not alter the operation of the economic loss rule. Although the EIFS is a separate product, the economic loss rule precludes plaintiffs from recovery on a strict liability theory, meaning that plaintiffs cannot recover under the Products Liability Act for damage to the EIFS itself. Instead, their recovery must be limited to such damages as the EIFS caused to the house's structure or to its environs.

Plaintiffs argue that the economic loss rule should not have been applied to them at all. They assert that they are purchasers in a non-commercial setting and that they do not have a contract remedy, contending that these are distinguishing factors that make it inappropriate to apply the economic loss rule to this dispute. As part of that analysis, plaintiffs ask us to consider

whether the goals of risk and loss allocation as between tort and contract that the economic loss rule was intended to achieve are fairly served by applying that rule to them. They argue that, in the absence of a legislatively-created remedial framework sounding in contract that affords them an avenue for relief, this Court should use the existing tort-based remedy expressed in the Products Liability Act, so as to create one.

The approach urged by plaintiffs, which asks us to find within the Products Liability Act a tort-based cause of action that would permit them to recover all of the costs of removal of the EIFS and repair of the home, is grounded on a fundamental misconception about the Products Liability Act itself. Clarity about what the Act is designed to do, and what it is most certainly not designed to do, will make clear the reasons for the result we reach.

As comprehensive as the Products Liability Act is and appears to be, its essential focus is creating a cause of action for harm caused by defective products. The Act's definition of harm so as to exclude damage a defective product does to itself is not merely the Legislature's embrace of the economic loss rule, but a recognition that the Act's goal is to serve as a vehicle for tort recoveries. Simply put, the Act is not concerned with providing a consumer with a remedy for a defective product per se; it is concerned with providing a remedy for the harm or the damage that a defective product causes to people or to property.

Plaintiffs' suggestion that we interpret the Act to create a remedy for them because they perceive that they have no available contract remedy completely misses the point of the statute by failing to appreciate what it is that the Products Liability Act is designed to do. Indeed, whether or not plaintiffs now have a contract remedy is irrelevant to whether they have a cause of action under the Products Liability Act. In enacting the Products Liability Act, our Legislature did not intend it to be a catch-all remedy that would fill the gap created when ordinary contract remedies, including breach of contract, statutory causes of action, or express and implied warranty claims, were lost or unavailable.

Nor was it designed to transform a contract-like claim, that is, a claim that the product itself in some fashion fails to operate as it should, into a tort claim.

 Instead, the Legislature did quite the opposite, broadly defining tort remedies, creating a comprehensive framework for causes of action available to injured plaintiffs, and identifying defenses available to product sellers or manufacturers, but doing so with precise focus on the particular harm, namely a tort-based harm, that is permitted to be remedied through the statute. That being so, the answer to plaintiffs' request that we create a tort-like remedy to fill what they perceive to be a gap in otherwise available contract remedies is an obvious one. The Legislature's intent in enacting the Products Liability Act, as evidenced by its definition of harm, was to serve the same purposes addressed by the well-established common law economic loss rule of drawing a clear line between remedies available in tort and contract. Simply put, the Legislature did not regard the Act as a means to create an expansive tort remedy that would become available in the event that a plaintiff had no contract remedy or failed to pursue an available contract remedy; instead, it defined the role of tort remedies with care and precision.

There is no room, in light of the clear purposes of the Products Liability Act, to expand it so as to create a new remedy for plaintiffs' assertions that the product, EIFS, failed to perform as expected. Rather, we conclude that the economic loss rule, as embodied in the Act's definition of harm, precludes plaintiffs from recovering any damages for harm that the EIFS caused to itself. Notwithstanding that, because we also conclude that the EIFS was not so fully integrated into the structure of the house that the house effectively became the product for purposes of the economic loss rule, to the extent that the EIFS caused damage to the structure of the house or its immediate environs, plaintiffs retain a cause of action pursuant to which they may proceed against the product's manufacturer.

## V.

We therefore reverse the judgment of the Appellate Division to the extent that it concluded that plaintiffs were precluded from pursuing any remedy under the Products Liability Act and we remand this matter for further proceedings consistent with this opinion.

Justice RIVERA–SOTO, concurring in part and dissenting in part.

To the extent the majority concludes that the economic loss doctrine bars recovery in this case, I concur. In respect of the remainder of the majority's opinion, however, I dissent substantially for the reasons so ably set forth in Judge Carchman's majority opinion. *Dean v. Barrett Homes, Inc.*, 406 *N.J.Super.* 453, 455–73, 968 *A.*2d 192 (App.Div.2009). I add only the following two points.

First, the Appellate Division's decision consists of both a majority opinion and an opinion concurring in the judgment only.[1] That concurring-in-the-judgment opinion gratuitously addresses a question that, simply put, is not present in this case. As the concurring judge explained,

> I write separately to express concerns about the scope and application of the "economic loss" doctrine in circumstances involving a homeowner who, *unlike the instant plaintiffs,* is unaware of the latent risks of a defective component product that was used in the construction of his or her home. In my view, such an innocent home purchaser should be able to recover, under the Product Liability Act, *N.J.S.A.* 2A:58C–1 to –11 ("PLA"), reasonable compensation from the manufactur-

---

[1] The conflict generated by the Appellate Division's majority and concurring-in-the-judgment opinions also raises a quarrelsome procedural point not discussed either by the parties or the courts. The appellate panel consisted of three judges: Judges Carchman, Sabatino and Simonelli. The "majority" opinion is signed by Judge Carchman, while the concurring opinion—which concurs only in the judgment—is signed by Judge Sabatino and is joined in by Judge Simonelli. If that is the tally, then how does the "majority" opinion command a majority of that three-member panel? Simple arithmetic would require a result different from that embodied in the Appellate Division's dueling opinions, and no satisfactory answer has been provided to that procedural conundrum.

er of that defective component for the physical harm the component caused to other portions of the home and to any other property owned by the plaintiff. [*Id.* at 473, 968 *A*.2d 192 (emphasis supplied).]

Thus, to the extent the concurring opinion deals solely with circumstances other than those presented in this case, that concurrence in its entirety is dicta, that is, "something that 'is unnecessary to the decision in the case and therefore not precedential[.]' " *Lucent Techs., Inc. v. Twp. of Berkeley Heights*, 201 *N.J.* 237, 252, 989 *A*.2d 844 (2010) (Rivera–Soto, J., concurring) (quoting *Black's Law Dictionary* 1100 (7th ed. 1999)); *see also State ex rel. J.A.*, 195 *N.J.* 324, 355–56, 949 *A*.2d 790 (2008) (Rivera–Soto, J., dissenting) (describing indifference to faithful and disciplined appellate review as "relegat[ing] its entire . . . analysis to the chiaroscuro of dicta" and noting that " 'dicta cannot be *res adjudicata* from the very definition of the terms.' " (quoting *J.J. Hockenjos Co. v. Lurie*, 12 *N.J. Misc.* 545, 548, 173 *A*. 913 (Sup.Ct.1934))).

Second, the majority's conclusion that "the integrated product doctrine does not apply to the facts before this Court," *ante* at 289, 8 *A*.3d at 768, defies basic common sense. As the majority must concede, the "product" at issue here is an Exterior Insulation Finishing System (EIFS), that is, an exterior finish that is applied *permanently* to a home. *Ante* at 289–90, 8 *A*.3d at 767–68. *See Simmermon v. Dryvit Sys., Inc.*, 196 *N.J.* 316, 321, 953 *A*.2d 478 (2008) (describing "Dryvit"—a brand of EIFS—as "synthetic stucco"); *DKM Residential Props. Corp. v. Twp. of Montgomery*, 363 *N.J.Super.* 80, 83, 831 *A*.2d 110 (App.Div.2003) (describing EIFS as "an exterior, synthetic, stucco-like finish" applied to a home). As noted in David L. Grenier and William J. Jorgensen, *Exterior Insulation and Finish System (EIFS): An Overview, available at* http://www.c-risk.com/Articles/dlg_EIFS_overview. htm:

EIFS was first introduced in post-World War II Germany to resurface buildings, which had damaged masonry. It was subsequently introduced in the United States in the late 1960's and its use has become widespread over the past thirty years. Sometimes called "synthetic stucco," EIFS is a multi-layered exterior barrier-type system designed to prevent moisture intrusion into exterior walls. The system consists of four main components:

1) Panels of expanded polystyrene foam insulation installed with adhesive or mechanically fastened to the substrate, usually plywood or oriented strand board (OSB),

2) A base coat that is troweled over the foam insulation panels,

3) A glass fiber reinforcing mesh is laid over the polystyrene insulation panels and fully imbedded in the base coat,

4) A finishing coat is then troweled over the base coat and the reinforcing mesh.

The base coat, mesh, and finishing coat is usually approximately 1/8 to 1/4 inches thick.

To claim that any system so designed and installed is anything other than permanently integrated into the structure to which it is applied simply makes no sense.

As the facts in this case pointedly describe, the EIFS exterior finish permanently was installed when the home was first built; that permanent exterior finish was part and parcel of the home when the original owners of this home purchased it; and that permanent exterior finish obviously remained an integrated part of this home when plaintiffs purchased it from the original owners. In those circumstances, the majority's conclusion that the exterior finish to this home had not "been sufficiently integrated into the home to become a part of the structure for purposes of broadly applying the economic loss rule[,]" *ante* at 302, 8 *A*.3d at 775, runs contrary to stark reality. According to the majority,

the EIFS was affixed to the exterior walls to create a moisture barrier, much like exterior vinyl siding. That is, it did not become an integral part of the structure itself, but was at all times distinct from the house. It remained, therefore, a separate product for purposes of our analysis.

[*Ibid.*]

The notion that an exterior finish that can only be removed by extensive demolition work is not "integrated" into the structure to which it is attached is so fanciful, so nonsensical, that it beggars the imagination. It is a conclusion that can germinate only in the minds of lawyers and can find root only in the rarified environment of this Court's decisions; it cannot, however, long survive in the atmosphere of the real world. EIFS is in many relevant respects no different than roofing shingles. Yet, applying the majority's reasoning, the roof of a home is not integrated into that

home. *See, e.g., Lee Wholesale Supply, Inc. v. Yacos (In re Yacos),* 370 *B.R.* 131, 135 (Bankr.E.D.Mich.2007) ("Existing residential homes, like other buildings, have roofs. Repairing and replacing roofs requires one to put the parts together to form the complete integrated object (i.e., the building). That the roof being repaired or replaced happens to be constructed on an existing home rather than a new home does not make it any less an act of construction of a building.") There is no kind way to put it: the majority's reasoning simply makes no sense.

Until today, New Jersey courts had embraced the reasonable and logical conclusion that the integrated product/component part rule of the economic loss doctrine forbade the kind of hairsplitting that would permit the result the majority reaches. In *Marrone v. Greer & Polman Construction, Inc.,* 405 *N.J.Super.* 288, 964 *A.*2d 330 (App.Div.2009), the Appellate Division recently confronted and readily resolved the very issue that is so vexing to the majority. In that case, a homeowner—like plaintiffs here—purchased from the then-owners an existing home that originally had been constructed using an EIFS exterior finish. *Id.* at 291, 964 *A.*2d 330. After buying the home, the homeowner received notice from his homeowner's insurance carrier "threatening to cancel their coverage because of the EIFS cladding on the house." *Ibid.* The homeowner sued and the trial court dismissed the complaint, explaining that "[w]here a component of an integrated product causes injury solely to the integrated product, the damage to the integrated product is not considered separate property damage that would remove the claim from the realm of contract law into the field of tort law. Such is the case here[.]" *Id.* at 293, 964 *A.*2d 330. The Appellate Division concurred, concluding that, in the circumstances presented, "the house is the 'product,' and it cannot be subdivided into its component parts for purposes of supporting a [Products Liability Act] cause of action." *Id.* at 297, 964 *A.*2d 330. *See generally Alloway v. General Marine Indus.,* 149 *N.J.* 620, 695 *A.*2d 264, 267–68 (1997) (explaining that "tort principles are better suited to resolve claims for personal injuries or damage to other property[,] ... [c]ontract principles more

readily respond to claims for economic loss caused by damage to the product itself" (citations omitted)).

One cannot help but ponder whether—in the absence of a lawyer's logical whimsy—everyday homeowners who have exterior finish systems attached to their homes would ever think that those systems are not "integrated" as part of their homes. Because I cannot join in that unexplained, unexplainable and unnecessary departure from reality, I dissent.[2]

---

[2] Despite direct authority in our own State to the contrary, the majority nevertheless discards the application of the integrated product rule of the economic loss doctrine in this case based on two California cases that—incredibly—hold that neither the windows of a home nor its foundation are "integrated" into the home. *Ante* at 302–03, 8 *A*.3d at 775–76. In so doing, the majority relies on two outlier decisions and ignores the far better reasoned, almost universal weight of authority nationwide that bars plaintiffs' action under the integrated product rule of the economic loss doctrine.

The cases either directly or impliedly supporting the rather unremarkable proposition that an EIFS system is integrated into a building and, hence, is subject to the economic loss rule are legion; the following is not exhaustive, but merely illustrative.

Federal: *Saratoga Fishing Co. v. J.M. Martinac & Co.*, 520 *U.S.* 875, 117 *S.Ct.* 1783, 138 *L.Ed.*2d 76 (1997) (holding that extra fishing equipment and spare parts, added to ship by user after initial sale, were not part of original ship with a defective hydraulic system that itself caused harm at issue); *E. River S.S. Corp. v. Transamerica Delaval*, 476 *U.S.* 858, 106 *S.Ct.* 2295, 90 *L.Ed.*2d 865 (1986) (barring recovery in tort for damages caused by defective turbine engines installed by manufacturer in four ships); *HDM Flugservice GmbH v. Parker Hannifin Corp.*, 332 *F*.3d 1025, 1030 (6th Cir.2003) (barring recovery for damage to helicopter from allegedly defective landing gear under a species of integrated product rule); *All Alaskan Seafoods, Inc. v. Raychem Corp.*, 197 *F*.3d 992, 995 (9th Cir.1999) (referring to integrated product rule as "component part rule" and describing it as "[a] corollary to the economic loss rule"); *In re GMC*, 383 *F.Supp.*2d 1340, 1343–44 (W.D.Okla.2005) (noting that "[r]esolution of the issue requires the court to define the relevant product—does it consist of the defective component or the finished product into which the component is integrated[,]" and explaining that "[w]hen addressing claims based on defective components, most courts have held that the relevant 'product' is the finished product into which the component is integrated").

*Alabama: Keck v. Dryvit Sys.*, 830 *So.*2d 1, 6, 7 (Ala.2002) (explaining, in context of EIFS system, that "[w]hether an item that is incorporated into real property may be considered [integrated] is determined by whether the item is a part of the structural integrity of the house or building that is reasonably

expected to last for the useful life of the house or building[,]" describing EIFS as "a multilayered wall system that actually composes the exterior walls of a building. By virtue of the very function of the EIFS as an exterior wall system, the EIFS could not be a structural component of a building that one might expect to replace after normal wear and tear. A stucco exterior wall is the equivalent of a brick wall; it is a part of the structural integrity of a house—a homeowner expects it to be weather resistant and to endure for the entire useful life of the house" and ultimately holding that, for purposes of the economic loss doctrine, an EIFS system is part of the structural integrity of a house).

*Alaska: N. Power & Eng'g Corp. v. Caterpillar Tractor Co.*, 623 *P.*2d 324, 330 (Alaska 1981) (applying integrated product rule where component parts "are provided by one supplier as part of a complete and integrated package").

*California: Jimenez v. Superior Court*, 29 *Cal.*4th 473, 127 *Cal.Rptr.*2d 614, 58 *P.*3d 450 (2002) (barring product liability claim absent proof of economic loss arising from property damage other than damage to the defective product).

*Florida: Casa Clara Condo. Ass'n v. Charley Toppino & Sons*, 620 *So.*2d 1244, 1245 (Fla.1993) (economic loss doctrine bars claim against concrete provider for building where there was no damage to anything other than building itself); *Turbomeca, S.A. v. French Aircraft Agency, Inc.*, 913 *So.*2d 714, 717 (Fla.Dist.Ct. App.2005) (explaining that "[t]he airframe and engine are not two separate pieces of property-they are one product" and that "[c]ourts have refused to bifurcate products into parts where a component part harms or destroys the finished product"); *Jarmco, Inc. v. Polygard, Inc.*, 668 *So.*2d 300 (Fla.Dist.Ct. App.1996) (economic loss doctrine bars claim against distributor of boat resin where only damage was to boat itself); *Am. Universal Ins. Group v. Gen. Motors Corp.*, 578 *So.*2d 451 (Fla.Dist.Ct.App.1991) (economic loss doctrine bars claim for loss of engine when damaged by replacement oil pump that was integral component of engine).

*Hawaii: Va. Sur. Co. v. Am. Eurocopter Corp.*, 955 *F.Supp.* 1213, 1216 (D.Haw.1996) (holding that "helicopter and engine, along with the fitting, constitute a single product for purposes of the economic loss doctrine").

*Idaho: Tusch Enters. v. Coffin*, 740 *P.*2d 1022, 1035–36 (Idaho 1987) (holding that "subsequent purchasers of residential dwellings, who suffer purely economic losses from latent defects manifesting themselves within a reasonable time, may maintain an action against the builder (or builder-developer, as the case may be,) of the dwelling based upon the implied warranty of habitability" but not in tort).

*Illinois: Trans States Airlines v. Pratt & Whitney Canada, Inc.*, 177 *Ill.*2d 21, 224 *Ill.Dec.* 484, 682 *N.E.*2d 45 (1997) (airplane hull not separate property from engine).

*Indiana: Gunkel v. Renovations, Inc.*, 822 *N.E.*2d 150, 156 (Ind.2005) (distinguishing between damage caused by "parts of a finished product damaged by components supplied to the seller by other manufacturers and imported into the seller's product" as barred by economic loss doctrine, and damage caused by "property acquired by the plaintiff separately from the defective goods or services" as recoverable "even if the defective product is to be incorporated into a completed product for use or resale").

*Kansas: Nw. Ark. Masonry, Inc. v. Summit Specialty Prods.*, 31 P.3d 982, 988 (Kan.Ct.App.2001) (holding that " 'damage by a defective component of an integrated system to either the system as a whole or other system components is not damage to 'other property' which precludes the application of the economic loss doctrine' " (quoting *Wausau Tile, Inc. v. County Concrete Corp.*, 226 Wis.2d 235, 593 N.W.2d 445, 452 (1999))).

*Maryland: Pulte Home Corp. v. Parex, Inc.*, 174 Md.App. 681, 923 A.2d 971, 1003 (Md.Ct.Spec.App.2007) (concluding, in defective exterior finish case, that "the economic loss [doctrine] prevents recovery for damage to property that consists only of the product itself").

*Massachusetts: Pro Con, Inc. v. J & B Drywall, Inc.*, 20 Mass.L.Rptr. 466 (Mass.Super.Ct.2006) (concluding that EIFS system, once installed on hotel, became an integral component of hotel's wall system barring tort recovery under economic loss doctrine).

*Michigan: Sullivan Indus., Inc. v. Double Seal Glass Co.*, 192 Mich.App. 333, 480 N.W.2d 623 (1991) (concluding that sealant used in assembly of insulated glass units was part of integrated product and, thus, tort claim was barred under economic loss doctrine).

*Minnesota: S.J. Groves & Sons Co. v. Aerospatiale Helicopter Corp.*, 374 N.W.2d 431, 432 (Minn.1985) (claim of failed part of helicopter causing crash barred by integrated product rule of economic loss doctrine); *Minneapolis Soc'y of Fine Arts v. Parker–Klein Assoc. Architects*, 354 N.W.2d 816, 817 (Minn.1984) (materialman providing bricks for non-load bearing façade not liable for failure as façade integrated into building).

*Nevada: Nat'l Union Fire Ins. Co. v. Pratt & Whitney Can., Inc.*, 107 Nev. 535, 815 P.2d 601 (1991) (economic loss doctrine bars recovery for loss of aircraft that harmed itself).

*North Carolina: Wilson v. Dryvit Sys.*, 206 F.Supp.2d 749, 753, 754 (E.D.N.C. 2002) (explaining that "North Carolina courts have indicated that when a component part of a product or a system injures the rest of the product or the system, only economic loss has occurred" and determining that EIFS system "is an integral component of plaintiff's house").

*North Dakota: Cooperative Power Ass'n v. Westinghouse Elec. Corp.*, 493 N.W.2d 661, 667 (N.D.1992) (holding that product manufacturer "may not be held liable in negligence or strict liability for economic loss caused by a failure of a component part of the [product] which causes damage to the [product] only").

*South Dakota: City of Lennox v. Mitek Indus.*, 519 N.W.2d 330, 333 (S.D.1994) ("When a defect in a component part damages the product into which that component was incorporated, economic losses to the product as a whole are not losses . . . and are therefore not recoverable in tort.").

*Texas: Pugh v. Gen. Terrazzo Supplies, Inc.*, 243 S.W.3d 84, 92 (Tex.App.2007) (noting that "Texas courts have rejected the argument that damage to a finished product caused by a defective component part constitutes damage to 'other property,' so as to permit tort recovery for damage to the finished product" and applying integrated product rule of economic loss doctrine to bar tort claim in respect of EIFS system installed on home).

*For reversal and remandment*—Chief Justice RABNER and Justices LONG, LaVECCHIA, ALBIN, WALLACE and HOENS—6.

*For concurrence in part/dissent in part*—Justice RIVERA-SOTO—1.

---

*Washington: Stieneke v. Russi,* 190 *P.*3d 60, 66 (Wash.Ct.App.2008) (barring tort liability for defective roof under integrated product rule of economic loss doctrine, and explaining that "a building constitutes a single 'product' or 'property,' not a series of component parts, for purposes of the economic loss [doctrine]").

*Wisconsin: Linden v. Cascade Stone Co.,* 276 *Wis.*2d 267, 687 *N.W.*2d 823, 824 (Wis.Ct.App.2004) (holding that "[t]he integrated system rule holds that once a part becomes integrated into a completed product or system, the entire product or system ceased to be 'other property' for purposes of the economic loss doctrine" and concluding that exterior stone stucco and roof systems were integrated into home); *Mequon Med. Assocs. v. S.T.O. Indus.,* 671 *N.W.*2d 717 (Wis.Ct.App.2003) (holding that EIFS system is integral part of building subject to economic loss doctrine); *Selzer v. Brunsell Bros.,* 257 *Wis.*2d 809, 652 *N.W.*2d 806, 818 (Wis.Ct.App.2002) (holding that "[t]he integrated system rule holds that once a part becomes integrated into a completed product or system, the entire product or system ceases to be 'other property' for purposes of the economic loss doctrine" and concluding that "windows and siding [a]re components of an 'integrated system' "); *Bay Breeze Condo. Ass'n v. Norco Windows, Inc.,* 257 *Wis.*2d 511, 651 *N.W.*2d 738 (Wis.Ct.App.2002) (holding that "[t]he economic loss doctrine applies to building construction defects when … the defective product is a component part of an integrated structure or finished product" and concluding that windows are an integral part of a house subject to economic loss rule).